RUDOLPH M. HIRSCHWALD, DAVID D. GOFF and ALEXANDER
N. RUBIN, a partnership of lawyers trading under the
firm name of HIRSCHWALD, GOFF AND RUBIN, DAVID
D. GOFF, as Voting Trustee; and Mary T. Lavin,

*vs.*

ERLEBACHER, INC., a corporation of the State of Delaware;
JULES C. WINKELMAN, individually and as Voting Trus-
tee; FRANK N. WINKELMAN: ELEANOR WINKELMAN
and SYLVIA WINKELMAN.

*New Castle, July 23, 1943.*

*Caleb R. Layton, 3rd,* of the firm of Hastings, Stockly and Layton, for complainants.

*Hugh M. Morris* and *Alexander L. Nichols,* of the firm of Morris, Steel, Nichols and Arsht, for respondents (excepting Jules C. Winkelman, individually).

PEARSON, Vice-Chancellor: This suit concerns a voting trust agreement entered into by the holders of all of the capital stock of respondent corporation. Complainants comprise the registered and equitable owners of 125 shares, and one of the voting trustees. Respondents comprise the corporation, the registered owners of the remaining 375 shares, and the other voting trustee. Complainants ask that all stock certificates, assigned to the voting trustees, be delivered to the corporation, and that the latter issue new certificates in the names of the voting trustees. Respondents oppose the granting of relief on various grounds. The principal defenses are stated in the answer of the corporate respondent as follows:

"Defendant admits that the Voting Trust Agreement * * * was executed, but avers that there was no consideration for the said agreement and that in equity, right and justice same should not have been requested or obtained by the plaintiffs, Hirschwald, Goff and Rubin, for the reason that at the time of and after the organization of the said corporation and the execution and delivery of the Voting Trust Agreement, the said firm were attorneys for all of the above defendants and the said Dr. N. W. Winkelman; that the corporation was formed and the assets acquired by it pursuant to an oral agreement between the said firm of attorneys and the individual defendants, by which it was agreed that the said firm should be paid for its services 25% of the common stock of the said corporation which was then in prospect, without any provision or condition whatever as to the voting rights or any other matter or thing whatsoever in connection with the said stock of the corporation. The said individual defendants and the said Dr. N. W. Winkelman had valuable voting rights incident to their stock, and as their counsel the said firm ought not in equity, right and justice have requested the surrender of the majority voting power of the said individual defendants and Dr. N. W. Winkelman who were all members of one family, thus constituting an harmonious

group, when there was no benefit to them and no actual consideration for their entry into such an agreement."

Other defenses will be stated in the discussion of the case.

From the evidence, it appears that in May, 1939, one Barney Winkelman, a lawyer and a brother of respondent Jules C. Winkelman, consulted complainant Hirschwald, a member of the law firm of Hirschwald, Goff and Rubin. Barney sought to engage Hirschwald to protect the interests of Jules in a corporation, Bonwit Lennon Company, which had filed a petition for reorganization under the *Bankruptcy Act*, 11 *U.S.C.A.* § 1, *et seq*. The corporation had operated two stores, one in Baltimore and one in Washington. It was in financial difficulties. Barney told Hirschwald that he had communicated with counsel for a creditors' committee and with the trustee in bankruptcy, but had not succeeded in working out a reorganization. Hirschwald investigated the matter and asked to see Jules, to whom he referred as "the party in interest". Jules called at Hirschwald's office. Then, or at a later conference, Hirschwald's partner, the complainant Goff, took over the conduct of the case because of illness of Hirschwald. The subject of fees was mentioned at an early conference with Jules. Hirschwald testified that he stated that he would prefer to be paid a retainer at once, and a fee at the conclusion of the matter commensurate with the efforts and time devoted to it. Jules replied that he was not in a position to pay a retainer and would prefer that an arrangement be made for a contingent fee. An arrangement was discussed whereby Hirschwald, Goff and Rubin should receive a 25% interest in the business, if it should be continued by Jules upon reorganization. Hirschwald said that a 25% interest would be satisfactory only on condition that his firm should have certain control (Jules denies that "control" was mentioned), for reason that "although we don't question your honesty or your integrity, you would be subject to the temptation of putting

people on the payroll, padding salaries, and making various disbursements that would make our twenty-five per cent interest utterly worthless."

On July 24, 1939, Jules signed and respondent Frank N. Winkelman approved a letter (dictated by Goff) directed to Hirschwald, Goff and Rubin, setting forth an understanding as to fees. Briefly, the letter states that the attorneys should receive 25% of any cash which might become payable to Jules upon liquidation of the corporation in bankruptcy, and 25% of the stock of any reorganized corporation. The letter also states:

"It is further understood that there will be a limitation of all salaries paid by the companies and provisions for the safeguarding of unwarranted expenditures, satisfactory to you, so as to avoid dissipation of the property. * * *

"You are likewise to be retained as counsel of the new company or companies on an annual basis, and if you so desire you are to act on the Board of Directors."

Goff did considerable work on the case. He presented a plan of reorganization, but upon objection of creditors it was not approved by the court. The assets of the corporation were ordered to be sold at public sale. Goff found a group who advanced money to purchase the assets at the sale. Jules and his family agreed to supply funds to repay these advances. After some delays, this was done. Goff had the respondent corporation organized in August, 1939, and the assets acquired at the bankruptcy sale were transferred to the corporation. Its 500 shares of stock were issued, initially, 489 shares to Frank N. Winkelman (father of Jules), 10 shares to Eleanor Winkelman (sister-in-law of Jules), and 1 share to Sylvia Winkelman (wife of Jules), all respondents here. Later, 125 of Frank's 489 shares were transferred to complainant Lavin, a nominee of Hirschwald, Goff and Rubin, pursuant to the fee agreement. The original directors elected were Frank, Jules, Sylvia, and Eleanor Winkelman.

Thereafter, on September 6, 1939, Goff presented to Jules a form of voting trust agreement providing for a term of five years, and designated Jules and Goff as the voting trustees. Jules testified, when asked what were the circumstances under which Goff submitted the agreement to him, as follows:

"He explained to me that they were minority stockholders, that that gave them very little, that the value of the stock of minority stockholders was very small unless they had some protection, and this agreement was drawn to give them some protection."

Jules read the agreement. There is a conflict in the testimony whether he took the agreement out for his brother Barney to consider, and whether Goff opposed his consulting Barney for this purpose. In any event, Jules signed the agreement in the morning, and it was signed by the stockholders, Frank, Eleanor, and Sylvia Winkelman at a meeting that evening. The stockholders endorsed their certificates and left them with Goff. Each was stamped with a legend indicating that the rights of the stockholders were limited by the terms of the voting trust agreement. The stock was not transferred on the corporate books to the voting trustees; no voting trust certificates were issued to the depositing stockholders; and, until December, 1941, a copy of the agreement was not filed in the office of the corporation in Delaware as required by the statute. On September 6, 1939, Frank and Sylvia Winkelman signed undated letters of resignation as directors; and Eleanor signed a resignation as an officer of the corporation. The letters were left with Goff.

Goff, or his firm, acted as counsel for the corporation for two years, and received compensation therefor. At least during the first part of this period, Jules consulted Goff on numerous occasions with respect to legal and nonlegal questions concerning the business. A firm of accountants selected by Goff furnished monthly audit reports to

Goff and Jules. During part of the time, daily statements were supplied to Goff.

At the 1940 stockholders' meeting, the original directors were re-elected by vote of the stockholders. The selection of these directors had the previous approval of Goff. By the time of the 1941 meeting, a difference had arisen between the Winkelmans and the attorneys. At the meeting, Jules questioned the validity and effectiveness of the voting trust agreement. A proxy appointed by Frank N. Winkelman stated that he intended to vote the shares registered in Frank's name, and called attention to the facts that the agreement does not state that it should be effective as of September 6, 1939, and that the voting trust agreement had not been filed as required by the Delaware laws, and "in other respects fails to comply with the said laws." Jules and another Winkelman brother as proxies for Sylvia and Eleanor, joined in this statement. Goff, as voting trustee, attempted to vote the entire 500 shares in favor of certain directors; and Jules attempted to vote the 500 shares in favor of the old directors. Later, the proxies for the shares registered in the names of the Winkelmans voted, over Goff's protest, to re-elect the old directors.

Some time later Goff filed a copy of the voting trust agreement in the corporation's office in Delaware. He demanded that Jules deliver to the corporation the certificate (originally left with Goff and subsequently handed over to Jules at the latter's request) for 364 shares registered in the name of Frank, and that the corporation accept this and all the other certificates, and issue new ones in the names of the voting trustees. Refusal to comply was followed by this suit.

From parts of their argument, it would appear that respondents treat this as a suit to compel the stockholders to perform a promise to deposit their shares under the voting trust agreement. Actually, it is not a suit to enforce any promise of the shareholders. They have long since

deposited their shares. The purpose of the suit is to compel one of the trustees to perform fiduciary obligations and duties arising out of the agreement and the Delaware statute, and to require the corporation to perform certain statutory duties.

Respondents contend that complainants have failed to satisfy the burden, imposed upon them by reason of the attorney-client relationship between the parties, of showing that there was a sufficient consideration moving to the clients; that there was no undue influence or unfairness; that the respondents had all of the information and advice that it would have been complainants' duty to give them had complainants not been interested in the agreement; and that the transaction was as beneficial to respondents as if the latter had been dealing with a stranger. In discussing this contention, the portion relating to the giving of information and advice will be dealt with separately.

In support of the other parts of their contention, respondents argue that by entering into the voting trust agreement, the Winkelman shareholders conferred benefits upon the complainant attorneys without receiving any benefits in return; that the letter of July 24, 1939, limited and fixed the compensation of the attorneys; that the voting trust agreement goes beyond the purposes stated in the letter, gives complainants more than they were entitled to under the letter, and is not supported by an adequate consideration; and that to request the shareholder-clients to enter into the agreement was unfair and inequitable.

There is evidence that the complainant-attorneys represented Frank and Sylvia Winkelman, as well as Jules. However, it appears that Jules was the chief party in interest when the attorneys first took the case, and that thereafter, in attorney-client negotiations, Jules spoke for the others. They were willing to accept the complainants as their counsel, and to accept the benefits of their work. Whatever part or interest the others had in the matter, clearly they became

obligated to compensate the attorneys for their services, pursuant to the arrangements made by Jules.

Consequently, when on September 6 the voting trust agreement was executed, the clients were under an obligation to the attorneys at least to the extent of the provisions of the letter of July 24. The attorneys had received 25% of the stock of the corporation, but they were entitled to something more, which had been indicated but not fully defined in detail. The letter expressly stipulated that provisions to be made for the purpose of safeguarding unwarranted expenditures should be "satisfactory to" the attorneys. The letter, addressed to the attorneys, provided that "if you so desire you are to act on the Board of Directors." The attorneys take the position that the voting trust agreement was adopted as a means of satisfying the additional obligation to them, for the purpose of supplying some protection for their minority interest, a matter upon which they had insisted from the very outset when they first consented to act for a contingent fee. Jules' testimony discloses his awareness that the voting trust agreement was intended to serve as a form of protection to complainants. He was apparently willing throughout that they have some protection. This dominant purpose of protection is a determining element in the construction of the letter.

While the voting trust agreement would, during its term, prevent the majority stockholders from exercising voting powers, it is difficult to conceive of any effective means of accomplishing the objects intended, which would not curb important rights otherwise exercisable by the shareholders, directly or indirectly. And advantages to the attorneys and disadvantages to the Winkelmans resulting from its operation are not of a permanent nature, the term of the trust being five years. Even under respondents' theory, the power "given" the minority stockholders, is no more than a veto power. It does not enable them to take affirmative action against the will of the majority. When

the agreement was executed, the original directors, consisting of all of the majority stockholders, plus Jules, had already been elected. Hence, under respondents' theory, no new board could be elected if the voting trustees should be in complete disagreement. I do not attach much significance to the undated letters of resignation of two of the directors, for no reason has been suggested why the resignations could not have been acted upon, one at a time, and the vacancies filled by the remaining directors. § 30 *Del. Corp. Law, Rev. Code of Del.*, (1935) § 2062.

It seems to me that complainants have demonstrated that the voting trust agreement, viewed in the light of surrounding circumstances, was not an unconscionable exaction to satisfy respondents' obligation, and was not unfair or inequitable to them.

The argument that complainants failed to sustain the burden of showing that the respondent shareholders were informed of the effect of the voting trust agreement goes beyond the issues raised by the answers. There is no intimation in the answers that respondents had not understood the agreement. No respondent, except Jules, testified as to his or her understanding of the agreement when it was executed. Moreover, it is significant that none of the respondents or their representatives at the 1941 stockholders' meeting stated, as a ground of objection to the vote of the shares by the voting trustees, that they had misunderstood the agreement.

As was stated in *Peyton v. William C. Peyton Corp.*, 23 *Del. Ch.* 322, 7 *A.* 2d 737, 123 *A.L.R.* 1482, the general principles applicable to fiduciary relations are well understood. No fault is found with the proposition asserted that attorneys, dealing with their clients, owe a duty to see that the clients are properly informed with respect to the character and consequences of their acts. However, the necessity of proving performance of that duty in a case involving attorney-client transactions depends upon the particular

issues raised. Where the clients give no indication that they acted under a misapprehension, or that they were in some material respect misinformed, mislead or left in ignorance, I am unable to see why attorneys should be called upon to prove performance of the duty. Certainly, as to the respondent shareholders, there is no reason whatever to assume that they did not correctly understand the voting trust agreement, in view of the fact that they have not themselves come forward to say so, and in view of the testimony that the subject of a voting trust was discussed at a meeting attended by them in August, 1939, and that the agreement was read to them before they executed it.

As to Jules, the situation is different only in that he testified that he did not understand the agreement when he signed it. However, in spite of his denials, the evidence is persuasive that the subject of a proposed voting trust was discussed with him at meetings in August before a form of agreement had been drafted. On September 6, he read the agreement in Goff's presence and there was some discussion about it. The essential object and effect of the agreement was to transfer the voting rights of the shareholders to the voting trustees, Jules and Goff, so that they might exercise such rights. This is the aspect of the agreement to which respondents' present objections are directed. Let us examine the following quoted provisions of the agreement:

"Whereas, the stockholders deem it for the best interests of themselves and of the corporation to act together concerning the management of the corporation, and, to that end, to unite the voting powers held by them as stockholders, and to assign, transfer and vest the same in the hands of the Voting Trustees, all as hereinafter more particularly provided:

"Now, Therefore, It Is Mutually Agreed as follows:

"1. That each and every stockholder of the corporation, as now or hereafter constituted, may become a party to this agreement, by depositing with the Voting Trustees, certificate or certificates for his or her said shares of stock, together with a proper and sufficient in-

strument, duly executed, for the transfer thereof to the Voting Trustees. * * *

"8. That the Voting Trustees shall have the right to vote the stock represented by the stock certificates, at all regular and special meetings of stockholders of Erlebacher, Inc., in the selection of directors, the increase or decrease of capital stock, for or against any proposed merger and all other matters that stockholders may vote upon, and that in so voting the Trustees shall exercise their best judgment, from time to time, to secure the election of suitable directors of the corporation, to the end that its business affairs shall be properly managed, and in the other matters upon which they may cast their vote, * * *."

Now, Jules had been in business since 1917, and had served as a director and officer of another corporation. It is unimportant whether he had previously heard of the expression "voting trust". It is important whether the language of the agreement is sufficiently clear so that it may fairly be considered appropriate to inform a person, situated as was Jules, of its object and effect. It seems to me that it is; and that the testimony concerning the discussions of a voting trust, and that Jules read the agreement, satisfies any burden falling on complainants of showing that the object and effect of the agreement were adequately explained.

This conclusion leaves little more to be said about respondents' contention, which they confidently and earnestly assert, that the failure to explain explicitly the effect of the statutory provisions for situations where voting trustees are in disagreement constitutes, without more, a breach of duty of such serious character as to prevent complainants from obtaining relief here. The statutory provisions applicable in this connection read thus (*Rev. Code of Del.,* (1935) § 2050):

"In any case where two or more persons are designated as Voting Trustees, and the right and method of voting any stock * * * are not fixed by the agreement appointing said Trustees, .* * * if they be equally divided as to the right and manner of voting the same in any particular case, the vote of said stock in such case shall be divided equally among the Trustees."

Whether the trustees be in agreement or disagreement as to the manner of voting, the power to vote is clearly vested in both of them by the agreement. They are two in number, and there is no intimation in the agreement that their rights should be unequal in nature or magnitude. If, contrary to fact, the statute had provided for an unequal division of voting rights, for example, in such way that Goff, as voting trustee, would have had superior rights or powers in the event of a disagreement, then there might be merit in respondents' position. The plain provisions of the agreement furnish no justification for any notion that the powers of either voting trustee were unequal to those of the other, whether the trustees might be in agreement or disagreement.

Respondents argue that the agreement would operate as an undue burden and hardship upon them because there is no reasonable probability that the voting trustees would be able to agree upon any matters, and hence, under the statute, the vote of the stock would "be divided equally among the Trustees." From this they conclude that the orderly conduct and operation of the corporation's business would be impeded and prejudiced. I find no justification for the assumption that the voting trustees will continue to disagree. Besides, a division of voting power equally among voting trustees would not, of itself, create a hardship, for such division is expressly sanctioned by the statute. The defense of hardship will not stand.

Finally, respondents contend that complainants' conduct evidences either an abandonment of the agreement, or a disregard of the statutory procedures for the regulation of the internal affairs of a corporation, so that they have forfeited any right to relief in this suit. This defense is not substantial. Although for more than two years after the execution of the agreement no attempt was made to comply with the statutory provisions concerning the filing of a copy of the agreement and the issuance of stock certifi-

cates in the names of the voting trustees, nevertheless, in various ways Goff's conduct was consistent with his powers as a voting trustee. Jules and Goff conferred with respect to the directors to be elected at the 1940 meeting, and approved the re-election of the incumbents. Goff attempted to participate in the selection of directors at the 1941 meeting. The evidence does not show an intent to abandon the agreement. Intervening rights of third persons are not involved. Nor has there been a change in position by respondents.

The argument that there has been a disregard of the statutory procedures for the conduct of the internal affairs of a corporation is premised upon the proposition that the individual respondents (except Jules) were mere figureheads, and did not properly function as directors. Respondents are not in a position to take advantage of this, even if it be true.

The foregoing conclusions have been arrived at without regard to a copy of a purported letter from Goff to Jules, introduced in evidence over respondents' objection. The question of its admissibility need not be determined, for the result of the case would not be affected.

A decree for complainants will be advised.

---

Note: On appeal the decree entered in this case was affirmed by the Supreme Court in a *per curiam* reported *post p.* 343.