AGNES B. APPON, CHARLES A. CORCORAN, J. ELIZABETH MACBEAN, individually and as Administratrix of the Estate of ELIZABETH F. MACBEAN, deceased, E. JANE MACBEAN, formerly known as E. JANE SLAUGHTER, and OAKDALE CONTRACTING CO., INC., a New York corporation,

*vs.*

BELLE ISLE CORPORATION, a Delaware corporation, MILTON K. HUPPUCH, T. LEONARD MACBEAN, MICHAEL V. KAY, JOHN J. DEFRAINE and NICHOLAS T. ROGERS, as Voting Trustees under a purported Voting Trust Agreement made as of the 22nd day of January 1929 in respect to common stock of Belle Isle Corporation.

CHARLES A. CORCORAN, T. LEONARD MACBEAN, AGNES B. APPON, J. ELIZABETH MACBEAN, individually and as the Administratrix of the Estate of Elizabeth F. MacBean, E. JANE MACBEAN and OAKDALE CONTRACTING CO., INC., a New York corporation,

*vs.*

BELLE ISLE CORPORATION, a Delaware corporation, ELINOR R. RUDD, JOHN J. DEFRAINE, NICHOLAS T. ROGERS, AUSTIN AGNEW and MARIUS S. JALET.

*New Castle, April 20, 1946.*

124

*Stewart Lynch*, of the firm of Lynch & Herrmann, (Michael A. Castaldi, of New York City, of counsel), for complainants.

*Leonard G. Hagner*, (Clinton DeWitt Van Siclen and Wilbur R. Shook, both of New York City, of counsel), for defendants.

SEITZ, Vice-Chancellor: Agnes B. Appon, Charles A. Corcoran, J. Elizabeth MacBean, individually and as administratix of the estate of Elizabeth F. MacBean, deceased, E. Jane MacBean, formerly known as E. Jane Slaughter, and Oakda'.e Contracting Co. Inc., a New York corporation, filed 'neir bill of complaint on January 9, 1946, praying in s'.ostance, that a certain voting trust agreement, as purportedly extended, be declared to be invalid and of no effect, and that the voting trustees be restrained from further acting thereunder and that the common stock registered in the names of the voting trustees be delivered to the present holders of the voting trust certificates. There was a further prayer requesting an injunction to prevent the voting trustees from voting the shares at a then forthcoming stockholders' meeting, but it has since been agreed that the meeting shall await the decision on these proceedings, so that prayer need not be considered further. The defendants named are the corporation and the voting trustees. All the parties defendant are before the court either by service of process or the filing of an answer.

Then on January 15, 1946, the same persons who filed the bill, together with T. Leonard MacBean who was named

as a party defendant in the bill, filed a petition under *Section* 31 of the *General Corporation Law, Rev. Code* 1935, § 2063, seeking to review an election of directors at a meeting of stockholders held September 21, 1945. Again the corporation was named defendant and the persons whose right to hold office by reason of such election were likewise named parties defendant. All the parties defendant are before the court.

In the petition to review the corporate election, as in the bill of complaint, the validity of the trust agreement as purportedly extended was attacked. In addition, the petition to review the election attacked the action of some of the voting trustees in seeking to act through proxies, as well as the conduct of the chairman of the meeting of stockholders in denying T. Leonard MacBean the right to vote certain stock which stood in his name, or for which he held a proxy.

On February 14, 1946, answers were filed, and thereafter, the complainants, pursuant to *Rule* 44 of this court, filed a motion for a decree notwithstanding the answer in each proceeding, and the arguments thereon were heard together, and this is the decision thereon. It was stipulated that the exceptions to the answer which were filed were not to be considered in passing upon the two motions.

In deciding the motions, it is necessary to consider the material allegations of the bill and the petition. I shall consider the bill first. It is alleged that each complainant owns both common stock and voting trust certificates of the defendant Belle Isle Corporation, a Delaware corporation. It is further alleged that the corporation has an authorized common stock of one million shares with a par value of 20 cents per share; that 991,267 shares of the common stock are outstanding of which 224,892 are held by the public and 766,375 shares are held in the names of the voting trustees; that as of January 22, 1929, five individuals, including T. Leonard MacBean, entered into a voting trust

agreement (a copy is attached to the bill) wherein the same five individuals were parties both as stockholders and as voting trustees; that many persons hold voting trust certificates; that on December 15, 1938, the voting trust agreement was extended for a period of five years to terminate on January 22, 1944 (a copy is attached to the bill); that thereafter on May 27, 1939, an attempt was made to extend the voting trust agreement further by making an agreement of extension (a copy is attached to the bill); that the purported extension of May 27, 1939, is as appears therefrom a nullity because it does not conform to the provisions of *Section* 18 of the *General Corporation Law of Delaware, Rev. Code* 1935, § 2050.

The bill prays that the voting trust agreement, as purportedly extended by the agreement of May 27, 1939, be decreed illegal, void and of no effect; that all the common stock registered in the names of the voting trustees be decreed to be delivered to the present holders of the voting trust certificates; that the deposit of shares of common stock of the corporation with the voting trustees be decreed now to be illegal and void and that the voting trustees be directed to assign and deliver to complainants the common shares of the corporation to which each is entitled upon the surrender of the voting trust certificates to the voting trustees; and that the court afford some such relief to the other voting trust certificate holders. Finally, the bill prays for a restraining order and an injunction *pendente lite,* embodying the same relief.

The answer of the defendants to the bill, in substance, admits all the material, factual allegations of the bill, but, of course, denies the legal conclusions alleged to result therefrom, and particularly, denies that the agreement of May 27, 1939 is invalid, but on the contrary, asserts that it is valid either as an extension of the original voting trust agreement, or as a new voting trust agreement.

Then by way of further answer the defendants allege

that T. Leonard MacBean, although named as a defendant, is prosecuting the suit and that all the complainants are under his domination and control. Facts are then set forth which allegedly show the complainants to be under the control of MacBean, and then a long series of events are alleged in which MacBean played the leading role, and from which defendants conclude that MacBean violated his position of trust as an officer of the corporation, both intentionally and by his mismanagement of the corporation.

It is alleged that the complainants and MacBean considered the voting trust agreement of May 27, 1939 valid and subsisting so long as MacBean was in complete control of the business affairs of the corporation, and that they did not attempt to attack the validity thereof until the newly elected directors and officers took steps to compel MacBean to account for his wrongful acts as president of the corporation, and to recover his wrongful gains from him.

Paragraphs 77, 78 and 79 of the answer set forth by way of legal conclusions the defenses of the defendants to the action:

"77. The aforementioned agreement of May 27, 1939 constituted a valid extension or a valid amendment of a prior extension of said Voting Trust Agreement dated January 22, 1929 or, in the alternative, said agreement of May 27, 1939 constituted a new and independent Voting Trust Agreement which is valid and subsisting.

"78. By reason of the foregoing facts, the complainants are estopped to deny that the Voting Trust Agreement is valid and subsisting until January 22, 1949.

"79. The complainants do not come into this Court with clean hands and are not entitled to the aid of this Court to set aside said Voting Trust."

The petition, filed under *Section* 31, sets forth generally the same facts with relation to the various voting trust agreements, and also recites that a special meeting of the stockholders of the defendant corporation was called for September 21, 1945. It alleges further that upon receiving

notice of this special meeting, the petitioner T. Leonard MacBean as president of the corporation wrote to the other four voting trustees on September 12, 1945 calling a meeting of the voting trustees for September 18, 1945 as a designated time and place in New York City; that MacBean received letters in reply from voting trustees Huppuch and DeFraine advising that they would not attend, and stating moreover that they had already issued proxies for the voting of the stock; that no reply was received from voting trustees Rogers or Kay, and that no meeting of the voting trustees was ever held as suggested by MacBean.

It is next alleged that the special stockholders' meeting was held on September 21, 1945; that a self-styled "proxy committee" of three (two being voting trustees) purported to present proxies and to act for and on behalf of a total of 777,944 common shares of the corporation; that as shown by a copy of the minutes of the meeting, the petitioners reserved the right to and now challenge the proxies above mentioned allegedly presented on behalf of four of the five voting trustees (the answer denies the preservation of the right, but I think this unimportant to the decision here).

Petitioners aver that such proxies were a nullity because they did not conform to the provisions of *Section* 18 of the *General Corporation Law of Delaware*, and the voting trust agreement as originally drawn and purportedly extended, and that the acts of the proxy committee were illegal, void and of no effect for the following reasons:

(a)   The voting trust agreement under which the voting trustees purported to act had expired before the meeting date.

(b)   The voting trust agreement under which the voting trustees purported to act contains no provision authorizing proxies.

(c)   No meeting of the voting trustees was ever held authorizing the use of proxies.

It is next alleged that despite their illegality, the proxies were allowed to be voted at the stockholders' election, and the proxy committee acted illegally to elect directors, as the minutes of the meeting indicate.

It is alleged that at the meeting, MacBean presented proxies for 89,623 shares and also sought to vote 78,810 shares of stock registered in his name; that despite *Section* 29 of the *General Corporation Law of Delaware, Rev. Code* 1935, § 2061, by action of the proxy committee, the petitioner MacBean was prevented from voting 75,000 shares held personally or by proxy; that the refusal to permit MacBean to vote the 75,000 shares was illegal and in violation of the Delaware law (the minutes indicate that 20,000 of the shares rejected were registered in the name of E. Jane MacBean, the wife of the proxy holder MacBean, and that the other 55,000 shares were registered in his own name).

It is further alleged that the chairman of the meeting illegally ruled a quorum present and in so doing ruled that the shares registered in the names of the voting trustees, and for which the proxy committee held a proxy could be counted.

The petition names those elected as directors and gives the number of votes received by each, and concludes by alleging that the election was illegal and that the directors in office prior to the purported election are at the present time the only legally elected directors of the corporation.

Petitioners pray for a hearing as to the validity of the election, pursuant to *Section* 31 of the *General Corporation Law,* and in particular to determine the right and power of the self-styled "proxy committee" to vote the stock of the purported voting trustees; and the right of the petitioner MacBean to vote the 75,000 shares which he was prevented from voting.

The portions of the defendants' answer directed to the paragraphs of the petition, in substance, admit the material,

factual allegations, but deny the legal conclusions which the petitioners draw therefrom, and on the contrary assert that everything which was done was legal and valid.

By way of further answer, it is once again asserted that the action is being prosecuted by MacBean and that all the other petitioners are under his domination and control. It is alleged that MacBean mismanaged the corporation, and also breached his fiduciary duty as president of the corporation. Substantially the same facts alleged by way of a further defense in the answer to the bill are repeated in the answer to the petition. It also contains certain allegations as to action taken by the new board of directors to recover the 75,000 shares of stock received by MacBean from the corporation.

Defendants conclude their answer to the petition by alleging that they properly and legally refused to permit MacBean to vote the 55,000 shares registered in his name and the 20,000 shares registered in his wife's name and for which he held a proxy because it was all illegally issued; and finally, that the agreement of May 27, 1939 is valid as an extension to the original voting trust agreement, or as a new and independent voting trust, but in any event by virtue of the facts alleged, petitioners are estopped to deny its validity or are precluded from so contending because of the doctrine of clean hands.

This matter comes before the court pursuant to a motion in each case for a decree notwithstanding the answer filed by complainants under *Rule* 44. Under this rule the court accepts for purposes of the decision thereon the truth of the facts set forth in the answer, but not any matter or conclusion of law which is alleged or suggested in the bill or answer, or which may be inferred from the facts stated. Thus, a defendant by a denial in his answer of a legal conclusion alleged or by the incorporation in his answer of a legal conclusion does not foreclose the court from determining such legal issue on a motion under *Rule* 44. See

*Ross, et al., v. Freeman, et al.,* 1935, 21 *Del. Ch.* 44, 180 *A.* 527.

As heretofore stated, the two proceedings were argued and are being considered at the same time. The parties raise five substantial points for determination:

1. Is the agreement of May 27, 1939 valid either as an extension to the original voting trust agreement, or as a new voting trust agreement?

2. Assuming the validity of the May 27 agreement, should it, nevertheless, be terminated short of its actual expiration date because its purpose has failed or been accomplished?

3. Regardless of the validity of the May 27 agreement, are the complainants estopped from denying its validity or precluded under the clean hands doctrine from so doing?

4. With respect to the stockholders' election, do voting trustees have the power to give proxies to others to vote stock registered in their names as voting trustees where the voting trust agreement is allegedly silent on the point, and where the voting trustees allegedly never met to determine for whom such stock would be voted?

5. With respect to the stockholders' election, can the person conducting the election prevent a registered shareholder from voting shares registered in his name or shares for which he holds a proxy solely for the reason that it is contended such stock was issued without consideration?

The discussion and conclusions herein are meant to apply to both proceedings and the parties thereto unless otherwise stated.

A determination of the legal status of the agreement of May 27, 1939 requires some factual background. As of January 22, 1929, five persons signing both as stockholders and as voting trustees executed an instrument entitled "Voting Trust Agreement." The agreement provided that

it should continue in effect for a period of ten years from its date. MacBean was one of the parties thereto.

On December 15, 1938, the same parties executed an agreement entitled "Extension of Voting Trust Agreement" wherein it was agreed "that a certain voting trust agreement dated January 22, 1929 by and between certain Stockholders of the said corporation and the above-named Voting Trustees shall be and hereby is extended for a period of five years from and after January 22, 1939 and until and including the 22nd day of January, 1944."

Thereafter, by an agreement made as of May 27, 1939 the same parties executed an instrument entitled "Extension of Voting Trust Agreement." It is around this agreement that the real struggle centers.

Turning now to a discussion of the legal aspects of the case, we find that the Belle Isle Corporation is a Delaware corporation, and it is assumed that the *General Corporation Law of Delaware, Rev. Code* 1935, § 2033 *et seq.,* controls in the determination of the problem here considered, namely, the validity of the agreement of May 27, 1939. Furthermore, all parties have assumed, as they must, that we are here dealing with agreements which are voting trusts within the meaning of that term as used in *Section* 18 of the *General Corporation Law of Delaware.*

The effect of *Section* 18 is to authorize and to provide the mechanics for what is commonly known as a voting trust "for any period of time determined by such agreement, not exceeding ten years, upon the terms and conditions stated in such agreement." The final paragraph of *Section* 18 reads:

"At any time within one year prior to the time of expiration of any such voting trust agreement as originally fixed or as extended as herein provided, one or more beneficiaries of the trust under such voting trust agreement may, by agreement in writing and with the written consent of such Voting Trustees, extend the duration of such voting trust agreement for an additional period not exceeding ten

years. Said Voting Trustees shall, prior to the time of expiration of any such voting trust agreement, as originally fixed or as previously extended, as the case may be, file in the principal office of the corporation in the State of Delaware a copy of such extension agreement and of their consent thereto, and thereupon the duration of such voting trust agreement shall be extended for the period fixed in such extension agreement; provided, however, that no such extension agreement shall affect the rights or obligations of persons not parties thereto."

Complainants contend that the agreement of May 27, 1939 is a purported extension of the voting trust agreement of January 22, 1929 as extended by the agreement of December ·15, 1938, and as such is illegal and void for failure to comply with the requirements of *Section* 18. Defendants contend on the other hand that the agreement of May 27, 1939 is valid under *Section* 18 as "either a new and independent Voting Trust Agreement or a valid amendment of the extension dated December 15, 1938."

The original voting trust agreement was dated January 22, 1929, and provided that it should continue in force "for a period of ten years from the date hereof."

On December 15, 1938, a short agreement was executed extending the voting trust agreement to January 22, 1944. It should be noted that this extension was executed during the *last* year of the existence of the original agreement, which otherwise would have expired on January 22, 1939.

Both sides concede that these two agreements complied with *Section* 18 of the *General Corporation Law of Delaware*.

However, on May 27, 1939, the agreement which accounts almost entirely for the present controversies was executed and it "extended [the previous agreements] until January 22, 1949." It should be noted that the May 27 agreement was *not* executed during the year immediately preceding the date when the original agreement as extended would terminate.

As stated, the complainants say that the May 27 agreement purported to be a further extension of the original voting trust agreement as extended, and because it was not executed within the period of one year immediately preceding the date when the agreement as extended would terminate, to-wit, between January 22, 1943 and January 22, 1944, it violated the specific language of *Section* 18 which provides that:

"At any time within one year prior to the time of expiration of any such voting trust agreement as originally fixed or as extended as herein provided, one or more beneficiaries of the trust under such voting trust agreement may, by agreement in writing and with the written consent of such Voting Trustees, extend the duration of such voting trust agreement for an additional period not exceeding ten years."

Complainants construe this provision of the statute as a mandatory requirement and conclude that the May 27 agreement is a nullity for failure to comply therewith. It is obvious, of course, that if the May 27 agreement is a nullity, there is no valid trust agreement at this time because the original agreement as extended expired by its terms on January 22, 1944.

Defendants contend, however, that the agreement of May 27, 1939 was either a new voting trust agreement altogether, or a valid extension of the original agreement.

Let us consider first the defendants' contention that the May 27 agreement constituted a valid extension of the original voting trust agreement. Clearly the May 27 agreement did not comply with the provision for extensions set forth in *Section* 18 because it was not executed within the last year of the preceding agreement. Therefore, if the agreement be an "extension" within the meaning of *Section* 18, and if the provision as to when extensions may be made be considered mandatory, then the contention that it is a valid extension must be rejected.

These points must, therefore, be decided:

1. Is *Section* 18 of the *General Corporation Law* exclusive?

2. Is the provision of *Section* 18 as to when extensions may be made permissive or mandatory?

3. Does the May 27 agreement purport to be an extension within the meaning of *Section* 18?

It seems to me that the late Chancellor, in effect, held *Section* 18 to be exclusive. Thus, in *Perry v. Missouri-Kansas Pipe Line Co.*, (1937) 22 *Del. Ch.* 33, 191 *A.* 823, 826, he said:

> "It is, I think, fair to say that the situation here with respect to the legality of voting trusts prior to the enactment of any statute dealing with the subject, is similar to that which prevailed in New York prior to the enactment in that state of its statute dealing with the subject. The Court of Appeals in New York in the case of *Matter of Morse*, 247, *N.Y.* 290, 160 *N.E.* 374, 376, pointed out the conflict in the authorities upon the question of whether so-called voting trusts were, in the absence of statute, in contravention of public policy and therefore void. * * * Prior to the statute in New York it appears that the courts of that state had never been called upon to pass upon the question of the legality of a voting trust. In the cited case the Court of Appeals, in interpreting the statute, disregarded as an immaterial aid the question of how a voting trust would have stood in the eyes of the law prior to the statute's enactment. It held in substance that the rule of the statute supplied the sole test of validity. * * *

> "The purport of this is necessarily to the effect that voting trusts generally are condemned as illegal, but that the state has granted a permissive power to create them to a limited extent. * * *"

In view of the approval with which the court quoted the New York case of *Matter of Morse*, 1928, 247 *N.Y.* 290, 160 *N.E.* 374, which held that their voting trust statute had pre-empted the field, I feel that this court has recorded itself similarly with respect to *Section* 18.

Is the provision of *Section* 18 as to when an extension may be made permissive or mandatory? *Section* 18 provides that there "may" be extensions upon compliance with

certain requirements therein set forth. Since the provision permitting an extension within one year prior to the expiration of an existing agreement is an integral part of the statute, it cannot be ignored. The defendants contend that the use of the word "may" shows that the provision of the statute as to extensions is permissive and does not preclude extensions at other times. However, in the light of the obvious purpose of the provision, it is clear that "may" is not used therein as defendants would construe it. The permissiveness is as to the *election* given to extend a voting trust agreement and not as to the time when it may be done. I conclude, therefore, that *Section* 18 requires an extension of an existing voting trust agreement to be executed within the period of one year immediately preceding the expiration date of the agreement sought to be extended. The May 27 agreement is invalid as an extension agreement because it does not comply with *Section* 18.

Defendants contend, however, that the May 27 agreement constituted a new voting trust agreement. Obviously, if defendants are correct in their contention, the agreement is perfectly valid under *Section* 18 because complainants suggest no reason why it should be held invalid if it is in fact a new voting trust agreement. Complainants insist, however, that the May 27 agreement purported to be—not a new agreement—but a further extension of the original agreement and that a reading of the three agreements in question excludes any other conclusion as to the legal nature of the instrument.

Let us scrutinize the May 27 agreement which was executed by the same parties who executed the original voting trust agreement and the first extension thereto. It is entitled "Extension of Voting Trust Agreement." It reads in part as follows:

"* * * the Parties hereto, each for himself and without regard to the joinder or validity of the joinder of any other Voting Trust Certificate holder do hereby covenant and agree that a certain Voting Trust Agreement dated January 22, 1929 by and between cer-

tain Stockholders of the said Belle Isle Corporation and the above-named Voting Trustees which was duly extended by written agreement dated December 15, 1938, until January 22, 1944, do hereby covenant and agree that said Voting Trust Agreement be and the same hereby is further extended until January 22, 1949 and do further agree that said Agreement be and it hereby is amended by modifying the terms of Clauses 1, 3, 5, 6, 11 and 12 thereof and by inserting therein a new Clause 2A, as follows: * * *."

There is then set forth a form of voting trust certificate to be used. This form of certificate recites, *inter alia*, as follows:

"This Certificate is issued under and pursuant to the terms and conditions of a certain Voting Trust Agreement dated as of the 22nd day of January, 1929, which was duly amended and extended on May 27, 1939, a copy of which is filed with said Voting Trustees and said Company, * * *.

"The original holder of this Certificate, and all transferees, by accepting a new certificate in lieu of one surrendered, shall be deemed to have assented to the terms and conditions of the Voting Trust Agreement dated as of the 22nd day of January, 1929, as amended and extended on May 27, 1939, pursuant to the terms of which this Certificate is issued."

The agreement of May 27, 1939, at least in the language used therein, purported to modify certain terms of the agreement of January 22, 1929. These modifications may be summarized as follows:

"Paragraph '1' was revised so as to provide for a new form of Voting Trust Certificate.

"A new paragraph, numbered '2A', was added providing for ten Voting Trustees instead of five and providing for the appointment of the additional trustees.

"Paragraph '3' was revised with respect to the manner of registering the stock deposited.

"Paragraphs '5' and '6' were revised so as to substitute 'eighty per cent (80%)' in place of 'four-fifths (4/5)'.

"Paragraph '11' was revised so as to provide that any stockholder could become a party by merely depositing his stock with the Voting Trustees without the necessity, as previously provided, of subscribing to the agreement.

"Paragraph '12' was amended so as to provide for extensions of the agreement."

As noted, the agreement of May 27, 1939 recited that the agreement of January 22, 1929, as amended by the agreement of December 15, 1938, "is further extended until January 22, 1949."

If the parties are to be taken at their word, as written in this agreement of May 27, the conclusion seems inescapable that they intended it to constitute, and it does in fact constitute, an attempt to extend an existing voting trust agreement rather than an attempt to create a new agreement.

Defendants brush these many extension references lightly aside and state that after the execution of the May 27 agreement, all parties acted under that agreement and they state further that "when the agreement was drawn the parties and their attorneys were not concerned with the strict legal interpretation of those words in the light of *Section* 18 but used them in their popular and loose sense." Needless to say, whatever the defendants mean by this statement, it can hardly be taken as a legally acceptable explanation for the failure to comply with a substantial requirement of our statute which "both defines the public policy of the State, with respect to voting trust agreements, and the limitations on that policy." *Aldridge v. Franco Wyoming Oil Co.*, (1939) 24 *Del. Ch.* 126, 7 *A.* 2d 753, 764.

Defendants lay great stress upon the fact that the agreement was unanimously approved, but this can hardly constitute a justification for failure to comply with the statute because by the very terms of *Section* 18 an agreement or extension is only binding on those who become parties thereto. Consequently, compliance with an affirmative requirement of the statute cannot be used as an excuse for failure to comply with some other affirmative and substantial requirement of the same statute.

Moreover, it has been made clear in this state with reference to another section of the corporation law that unanimous approval works no magic where the stockholders have—even by unanimous action—violated a requirement of the statutory corporation law. Thus, it was stated in *Gaskill v. Gladys Belle Oil Co.*, (1929) 16 *Del. Ch.* 289, 146 *A.* 337, 339:

> "The claimant contends that Section 34 of the by-laws was adopted by the unanimous consent of all the then existing stockholders of the corporation and, having been so adopted, the corporation as well as all subsequent stockholders are estopped from challenging its validity. That stockholders may by unanimous consent do many things which are binding and but for which assent would not be valid, may be true. Yet even so, it does not follow that in such a matter as this, they can override the law. Here they undertook to do something which there was a lawful way to do. They did not do it however in the way the law requires.

> "The unanimous consent which is said to have authorized the creation of the preferences by by-law action is ineffectual to do so in the face of such statutory provisions as are found in the Delaware act. Such authorization if valid can only be so on the theory that it is competent for the stockholders to waive the statutory requirement that the preferences shall be such as are specified in the certificate of incorporation. That the doctrine of waiver can operate to that extent, I think is clearly contrary to Delaware authority."

As a corollary to this argument, defendants say that all the beneficiaries of a voting trust may terminate it any time (citing *H. M. Byllesby & Co. v. Doriot*, (1940) 25 *Del. Ch.* 46, 12 *A.* 2d 603), so that "it necessarily follows that it is not in violation of *Section* 18 for the parties, contemporaneously with such termination, to enter into a new Voting Trust Agreement having a life of not more than ten years." Without passing upon the validity of this contention, it suffices to say that the parties did not terminate one voting trust agreement and contemporaneously with such termination enter into a new voting trust agreement. The May 27 agreement was in my opinion a purported extension of an existing voting trust. Moreover, the agreement explicitly identifies itself as an extension, and nothing

in the language of the agreement itself is inconsistent with this nomenclature. If language is to be accorded its usual and accepted meaning, especially when it is not at all unnatural or unreasonable to give it such meaning, then it appears clear that the May 27 agreement was an extension of the old agreement, and as such its legal validity must be judged by the requirements of *Section* 18 concerning extensions.

Finally, defendants contend that the substantial changes in the May 27 agreement create, in effect, a new agreement. Without attempting to decide what factors should be considered in determining whether a particular agreement is an extension or a new agreement within the meaning of *Section* 18, I do decide that the agreement of May 27 which is before me sufficiently identifies itself as an extension agreement to call for the application of the provisions of *Section* 18 governing extension agreements, and the fact that provisions in the original agreement were changed in the extension agreement does not, as I see it, change the result in this particular case.

An examination of the various definitions of "extension" or "to extend" is of little value because each is made with relation to the particular factual situation involved. Sometimes they are used interchangeably with "renewal" or "to renew". It seems to me that "extension" was not used with the intention that it apply only to time and I base my statement in part on the fact that *Section* 18 contemplates that an extension agreement may not have some of the same parties as the original agreement. Moreover, nothing in *Section* 18 prevents parties from incorporating in an extension agreement certain changes in the provisions of the original voting trust agreement. I conclude that the narrow definition of "extension" urged by defendants with its consequent purposeless rigidity is unacceptable.

Defendants conclude their arguments on this point with the statement that because they aver in their answer that

the agreement of May 27 was a new agreement, therefore, under *Rule* 44 this fact must, for the purpose of the motion, be taken to be true. This contention is fallacious because defendants' averment that the May 27 agreement is a new agreement amounts to a legal conclusion rather than an allegation of fact, and under *Rule* 44 as interpreted by this court in *Ross, et al., v. Freeman, et al., supra,* is the very point I am called upon to decide.

The provision of *Section* 18 requiring, in effect, that an agreement of extension, if any, must be signed within one year prior to the expiration date of the agreement sought to be extended cannot be cast aside as unimportant. While any number of reasons may have prompted the Legislature to incorporate this provision into the law, it seems to me that one reason was to make certain the period of the voting trust could not be extended until near the end of the trust itself, at which time it could be intelligently determined by the stockholders whether the purposes for which it was created had been defeated, altered or accomplished. While specific examples can be urged which would render such a reason for its existence nugatory, yet in practice I believe it has the effect stated.

In any event, the Legislature has spoken and the court cannot presume that this particular provision of *Section* 18 is not to be regarded as substantial and supported by reasons deemed adequate by the Legislature. Moreover, because it is a part of *Section* 18, I believe the Delaware authorities support the conclusion that the provision requiring renewal within the period of one year immediately preceding the termination date of the voting trust is a matter of substance and is mandatory. See *Perry v. Missouri-Kansas Pipe Line Co., supra; In re Public Industrials Corp.,* (1933) 19 *Del. Ch.* 398, 168 *A.* 82. The situation here involved is radically different from that before Vice-Chancellor Pearson in *Hirschwald v. Erlebacher,* (1943) 27 *Del. Ch.* 180, 33 *A. 2d* 148, with reference both to the

provisions of *Section* 18 involved and the objects of the litigation. Moreover, the whole tenor of the late Chancellor's opinion in *Perry v. Missouri-Kansas Pipe Line Co.,* *supra,* where he struck down a voting trust because it contained a provision for an existence of eleven years, rather than the ten which is authorized by the statute, is consistent only with a holding here that the May 27 agreement is a nullity for failure to comply with a mandatory and substantial provision of *Section* 18.

It is my conclusion that the May 27 agreement is not a new voting trust agreement, but it is a purported extension of the original agreement as extended and as such is invalid because it fails to comply with the provision of *Section* 18 dealing with extensions.

Because I have concluded that the May 27 agreement is a nullity, it is unnecessary for me to pass upon the further contention made by complainants that the voting trust, even if valid, should, nevertheless, be terminated because its purpose has failed or has been accomplished.

Defendants contend, however, that complainants are estopped to deny the validity of the agreement of May 27, or are precluded from asserting its invalidity under the doctrine of clean hands. Defendants go to great length in their answers to allege acts committed by MacBean which they contend constitute the basis for the application of the two doctrines. They couple these facts with the allegations in both actions that all the complainants are under the domination and control of MacBean, and have instituted these actions at his behest. Under these circumstances they contend, for purposes of applying the two doctrines, all the complainants stand in the shoes of MacBean.

I have not attempted to detail the myriad factual allegations relied upon by the defendants as constituting the basis for the application of the two doctrines. It will be assumed that facts are alleged in the answers which,

if proved, would ordinarily call for the application of the doctrines of estoppel and clean hands. I shall further assume that such facts may be used against all the complainants in the same manner that they could be used against MacBean. Having made these two sweeping assumptions, the question, nevertheless, arises as to the availability of these two defenses to the defendants to preclude the complainants from attacking the legality of the May 27 agreement on the ground that it violates *Section* 18 of the *General Corporation Law of Delaware.*

It is obvious, of course, that the facts which give rise to estoppel may differ radically from those involved in the application of the doctrine of clean hands, but having assumed facts to exist which meet the requirements of both doctrines, the question as to their use by the court to preclude complainants from asserting the invalidity which I have found to exist would seem to turn on the same factor, namely, the purpose and object of the statute violated by the agreement. If the public policy of the state as it is incorporated in a statute, will be frustrated by denying relief, based for instance on the defense of the clean hands doctrine, the court will not apply the doctrine. As the matter is stated in 3 *Pomeroy's Equity Jurisprudence,* (5th Ed.) § 941, *Note* 9:

"The equitable rule that he who comes into equity must come with clean hands has no application where its enforcement would result in maintaining an act declared by statute to be void or against public policy." See also 3 *Pomeroy's Equity Jurisprudence,* (5th Ed.) § 403.

The same rule applies to estoppel. 19 *Am. Jur., Estoppel,* § 39.

Reverting to the Delaware authorities, it seems clear that the Court of Chancery is committed to the principle that *Section* 18 reflects our public policy towards voting trusts which is to require a rather strict control. As the Chancellor said as late as 1939 in *Aldridge v. Franco Wyoming Oil Co., supra:*

"* * * This statute both defines the public policy of the State, with respect to voting trust agreements, and the limitations on that policy."

The court cited with approval the earlier case of *Perry v. Missouri-Kansas Pipe Line Co., supra,* where it was said:

"* * * In view of the pronounced disfavor in which voting trusts were first held by the courts, and later, when they were looked upon in some jurisdictions with indulgence, in view of the limitations with which they were hedged about, I do not see why the courts should be liberal in construing a statute which, as ours seems to me to do, lays down for them the law of their life. * * *"

It would appear, therefore, that the public policy of the State of Delaware towards voting trusts is incorporated in *Section* 18 and this public policy would be frustrated in part if a court were to prevent a person otherwise having a proper standing to complain from asserting that a particular voting trust agreement violates *Section* 18 because such person does not come into court with clean hands, or because there are facts which would otherwise justify an estoppel. While it is evident that in such a situation the court is met with two conflicting policies, nevertheless, the courts resolve the conflict in favor of the public policy of the state as set forth in the statute and set aside an agreement in violation thereof.

The fact that a person is a party to an illegal voting trust agreement does not preclude him from attacking it. As the Chancellor said in *Aldridge v. Franco Wyoming Oil Co., supra:*

"Parties to an alleged voting trust agreement, or outside stockholders, if injured thereby, may ordinarily attack the validity of such an agreement * * *."

In 5 *Fletcher Cyc.,* § 2086, it is stated:

"* * * either they [parties to the agreement] or their transferees or outside stockholders may attack it as illegal and claim appropriate relief from it."

I conclude, therefore, that because the complainants are attacking the legality of an agreement which violates

the public policy of the state, as reflected by *Section* 18, they may not be prevented from asserting such illegality because of the existence of facts which would otherwise call for the application of the doctrines of clean hands and estoppel against them.

As heretofore stated, complainants have raised two questions which are peculiar to the *Section* 31 proceeding to review the stockholders' election of September 21, 1945. First, the complainants challenge the right of some of the voting trustees to give—as they did—a proxy to vote stock registered in their names as voting trustees because they contend that the voting trust agreement does not so authorize them, and that, in any event, no meeting of the voting trustees was held to decide how the stock would be voted. Defendants contend that the answer shows that the voting trustees did not delegate their discretion in the manner indicated, but merely directed their proxies to vote for particular persons whom they designated. Having concluded, however, that the agreement of May 27 is a nullity and that the voting trustees, therefore, gave proxies pursuant to an invalid agreement with the consequence that the stockholders' election of September 21, 1945 must be set aside, I find it unnecessary to decide this question.

The second question peculiar to the *Section* 31 proceeding deals with the right of those in control of the stockholders' election to refuse to permit a registered shareholder to vote shares registered in his name and to vote as proxy shares registered in the name of another person solely because it is contended that such stock was issued without consideration. While there is ample decisional authority in this court to enable me to determine this point, nevertheless, because the election must, in any event, be set aside, I shall not decide the question.

My attention has been called to the fact that a suit is now pending in this court to cancel the shares involved under this phase of the case. Parenthetically, defendants

make much of the fact that if the voting trust is set aside the corporation will be unable to bring MacBean to task for his alleged wrongdoings because they say he will gain control of the corporation and the litigation directed against him. My answer to this must be that stockholders always have available to them a remedy to correct abuses by corporate officials, and I cannot assume that this remedy is without substance.

Having concluded that the agreement of May 27 is a legal nullity, it thereby becomes apparent that the stockholders' election held on September 21, 1945 was invalid and must be set aside because the voting trustees, acting pursuant to the invalid agreement, caused approximately 766,-375 common shares to be voted, whereas only 224,892 common shares were held by other individuals. Obviously, the votes cast by the voting trustees were determinative of the stockholders' election of directors held on September 21, 1945.

The motions for the decrees notwithstanding the answers will be granted.

As to the decree to be entered on the bill of complaint, it should provide that the voting trust agreement of January 22, 1929, as extended by the agreement of December 15, 1938, terminated by its terms on January 22, 1944, and that the agreement of May 27, 1939 is invalid and of no effect. It should further provide that the Belle Isle Corporation, directly or through the voting trustees, shall immediately deliver all the common stock now registered in the names of the voting trustees to the present holders of the voting trust certificates issued by the voting trustees and that the voting trustees shall be enjoined from purporting to act as such, except that they shall do everything necessary to effectuate the terms of the decree.

As to the petition filed under *Section* 31, the decree therein should also provide that the voting trust agreement

of January 22, 1929, as extended by the agreement of December 15, 1938, terminated by its terms on January 22, 1944, and that the agreement of May 27, 1939 is invalid and of no effect. It should recite that the stockholders' election held at the meeting of September 21, 1945 was invalid and of no effect. It should further provide for a stockholders' election to be held by a master in accordance with *Section* 31 of the *General Corporation Law* within a reasonable time after the corporation and the voting trustees shall have performed the acts required by this decree, as well as by the decree entered on the bill of complaint.

Decrees accordingly will be advised.

Note. The decrees entered in accordance with the foregoing opinion were affirmed by the Supreme Court on appeal. See *post p.* 554, 49 *A. 2d* 1.