GENERAL MOTORS CORPORATION,
a Corporation, Plaintiff,

v.

Earl BLEVINS, as Director of Revenue and as Motor Vehicle Administrator of the State of Colorado, David Walker, as Supervisor of the Motor Vehicle Dealers' Administrator of the State of Colorado, Duke W. Dunbar, as Attorney General of the State of Colorado, and Edwin C. Johnson, Governor of the State of Colorado, Defendants.

Civ. A. No. 5189.

United States District Court
D. Colorado.

Aug. 7, 1956.

382

Hodges, Silverstein, Hodges & Harrington, Denver, Colo., for plaintiff.

Duke W. Dunbar, Atty. Gen. of Colorado, Max D. Melville, and Fred M. Winner, Sp. Assts. to the Atty. Gen., for defendants.

Before PICKETT, Circuit Judge, and KNOUS and BREITENSTEIN, District Judges.

BREITENSTEIN, District Judge.

This is an action by General Motors Corporation against certain officials of the State of Colorado for a declaratory judgment and injunctive relief. The complaint alleges that a 1955 Act[1] of the Colorado General Assembly violates various provisions of the federal and state constitutions.[2]

### The Pleadings

A summary of the pleadings is essential to an understanding of the issues. After the requisite jurisdictional averments the complaint states that General Motors, a Delaware corporation, is engaged in the manufacture and sale of motor vehicles and of parts, accessories and tools therefor. These are all manufactured outside of Colorado and are shipped into Colorado for sale by a distributor and automobile dealers with whom General Motors has written agreements. The shipments are in interstate commerce. General Motors operates through various divisions known as Buick Motor Division, Oldsmobile Division, Pontiac Motor Division, Chevrolet Motor Division, General Motors Truck and Coach Division, and Cadillac Motor Car Division. Each of these divisions, except Cadillac, has agreements for the sale of the products of the division with Colorado automobile dealers. These are known as Direct Dealer Selling Agreements. A copy of a typical agreement is attached to the complaint. The Cadillac Division has a distributor which sells Cadillac products at retail and also distributes them to Colorado automobile dealers with whom the distributor has written agreements. General Motors maintains factory representatives and factory branches in Colorado to make and promote sales of its products.

The Direct Dealer Selling Agreements in existence at the effective date of the law[3] all bore a termination date of October 31, 1955, and provided that they might be terminated earlier under stated conditions. Provisions of the agreements which are particularly stressed relate to payment by the dealers for advertising, to the right of General Motors to select the mode of transportation of motor vehicles purchased by the dealers, and to the non-liability of General Motors for failure or delay in filling orders.

The 1955 law amended an existing statute relating to motor vehicle dealers. Among other things, the new act requires manufacturers, distributors, and their branches and representatives to secure licenses and give bonds. The cancellation of contracts between a manufacturer and dealer without an approving court order is forbidden. It is made a criminal offense for a manufacturer to induce or coerce a dealer to order or accept delivery of named items, to refuse

---

1. 1955 Colorado Session Laws, ch. 77, pp. 198–205.

2. The request for injunctive relief neces-

sitates a three-judge court as provided for in 28 U.S.C. § 2281.

3. April 15, 1955.

to deliver a motor vehicle within sixty days if that motor vehicle is publicly advertised for immediate delivery, to induce or coerce a dealer to enter into an unfair agreement, to cancel an agreement unfairly and without just provocation, to deny the right of a dealer to designate the method of transportation to be used in the delivery of ordered motor vehicles, to induce or compel a dealer to make payments for advertisement or promotional activities, and to do certain other things which, so far as pertinent, will be noted later. When a manufacturer is found liable in damages to any licensee, the amount of damages "so determined shall be trebled and shall be recoverable by the licensee so damaged."

The complaint further alleges that the 1955 Act declares it unlawful for General Motors to exercise certain rights and privileges reserved to it under its Direct Dealer Selling Agreements. Such rights include the right to terminate, the right to collect payments for advertising, and the right to direct the mode of delivery of ordered motor vehicles. It is asserted that the business of selling new motor vehicles is highly competitive and that, if General Motors is to continue to operate in a profitable and economical manner, it is essential that "it be legally entitled to solicit, urge, and induce the purchase of its products by its dealers through active and vigorous sales promotion."

Various constitutional violations are charged. Among these are:

1. The Act violates the commerce clause because it is burdensome and discriminatory.

2. It is an *ex post facto* law.

3. It impairs the obligations of contracts.

4. It denies the equal protection of the laws.

5. It deprives General Motors of its liberty to contract and of its property without due process of law.

6. It violates the principle of separation of powers.

It is charged that the defendants, all Colorado residents, threaten to enforce the law, to compel obedience by General Motors, and to subject General Motors and its employees to fine and imprisonment for violation of the law. Enforcement of the Act, it is alleged, will result in irreparable damage to General Motors. The complaint states that the Act is not necessary, reasonable, or appropriate for the protection of the public and is an effort to "regulate wholly private business transactions with which the public is not concerned."

The prayer is for an injunction to restrain the defendants from enforcing any provision of the law against the plaintiff and for a declaratory judgment declaring the law to be void in its entirety because of unconstitutionality.

By consent, a preliminary injunction was entered on November 15, 1955.

The original answer contains a motion to dismiss because of insufficiency of facts and alleges four defenses. The first defense consists of admissions and denials of allegations of the complaint. The second asserts the coercion of its dealers by General Motors and avers that the public welfare requires the curtailment of unfair and unreasonable sales practices and that the law was enacted under the police powers of the state.

The third defense is that the dealers' contracts and other agreements and practices between General Motors and its franchised dealers are agreements and practices in restraint of trade and commerce in violation of the Clayton and Sherman Acts[4] and are not entitled to the protection of the United States and Colorado Constitutions.

The fourth defense is that the relief sought is in furtherance of an illegal conspiracy in restraint of interstate trade and commerce and that General Motors may not invoke the equitable power of the Court to further such conspiracy.

4. 15 U.S.C.A. § 1 et seq.

On motion of General Motors the third and fourth defenses were stricken.

The amended answer withdraws the first and second defenses and realleges the fourth defense as stated in the original answer.

The third defense is completely rewritten. It states that General Motors is the largest manufacturer of motor vehicles in the world and annually ships into Colorado to Colorado motor vehicle dealers $100,000,000 worth of motor vehicles, parts, and accessories. All sales of General Motors motor vehicles in Colorado are made to franchised dealers with the intent of resale to the public. There is a public interest in the dealer agreements insofar as they may restrain trade or commerce, discriminate in price or quality, or violate Colorado laws. More than thirty per cent of all new motor vehicles sold in Colorado in 1955 were manufactured by General Motors.

It is charged that the dealer agreements lack mutuality, are unilateral in favor of General Motors, are not supported by consideration, and, as used by General Motors, constitute a restraint of interstate trade and commerce.

Defendants assert that General Motors, its officers, employees, and others have conspired and are conspiring to utilize the dealer agreements to require the franchised dealers to act in concert with General Motors to restrain and monopolize trade and commerce in various respects with the effect of lessening and suppressing competition.

On motion, the third and fourth defenses of the amended answer were stricken.

The defendants then withdrew all pending motions and elected to stand on their amended third defense and realleged fourth defense as set forth in the amended answer.

The Court set the case for trial. General Motors, before the trial date, filed a motion for default and a default judgment, or in the alternative for judgment on the pleadings.

On May 18, 1956, the matter came on for trial. General Motors introduced evidence in support of its complaint. No evidence was offered by the defendants.

### The Motions to Strike

When this Court sustained the motions to strike, it did not state its reasons. A proper disposition of the case makes it desirable to do so at this time.

The basic theory of the third and fourth defenses is that General Motors, by the use of its Direct Dealer Selling Agreements, has participated and is participating in a conspiracy to restrain and monopolize trade and commerce by the suppression of competition. It is said that a part of such illegal conspiracy is the prosecution of this action to uphold the dealer contracts and the present practices of General Motors in spite of the provisions of the 1955 law. Defendants argue that the motions to strike admit all facts alleged in the stricken defenses and, hence, there is an admission that General Motors has been and now is participating in an illegal conspiracy. It is urged that because of such conduct General Motors does not come into court with clean hands and under the appropriate maxim of equity may not maintain this action.

One form of relief sought herein is a declaratory judgment that the 1955 law is unconstitutional. There is uncertainty in the decisions as to whether or not equitable maxims and equitable defenses apply in a declaratory judgment action.[5]

---

5. In Bakelite Corp. v. Lubri-Zol Development Corp., D.C.Del.1940, 34 F.Supp. 142, 144, it was held that the technicalities of equity practice do not prevail in a declaratory judgment suit. A contrary decision was reached in Buromin Co. v. National Aluminate Corporation, D.C.Del., 1947, 70 F.Supp. 214, 216, which held that the equitable doctrine of "unclean hands" cannot be entirely discarded in a declaratory judgment action. The Court of Appeals for the Sixth Circuit has held that a declaratory judgment action is in the nature of an equitable proceeding and the equitable doctrine of laches should be applied. Bliss Co. v.

There is also a question as to whether the allegations of the third and fourth defenses are sufficient to charge a violation by General Motors of either the Sherman or Clayton Acts. Certainly it is doubtful as to whether these defenses set forth adequately specific facts from which it can be determined, as a matter of law, that the defendants did in fact, or are now in fact, violating these two statutes.[6] The allegations as to the existence, nature, or purpose of the conspiracy are at least of doubtful sufficiency to sustain either a civil action or a criminal prosecution under the Sherman or the Clayton Acts.

While the motions might well be disposed of on either of the two grounds just mentioned, we prefer to base our decision upon the principle that the misconduct of General Motors, if any there was, does not deprive it of the right to attack the constitutionality of the 1955 Colorado law.

In McFarland v. American Sugar Refining Co., 1916, 241 U.S. 79, 85, 36 S.Ct. 498, 60 L.Ed. 899, the sugar company attacked the constitutionality of a Louisiana statute. The state officials raised the defense that the company by conduct and by violation of the Sherman Act had made the attacked legislation necessary, and hence, the sugar company had no standing in a court of equity. The Court said that the general intimations of the company's wickedness did not deprive it of its constitutional rights or prevent it from asserting them in a practicable way. 241 U.S. 85, 36 S.Ct. 500.

The case of Toomer v. Witsell, 1948, 334 U.S. 385, 393, 68 S.Ct. 1156, 92 L.Ed. 1460, was a suit to enjoin, as unconstitutional, the enforcement of South Carolina statutes governing commercial shrimp fishing. Some of the plaintiffs had been convicted of shrimping out of season. The Court held that this previous misconduct did not have any relation to the constitutionality of the challenged statutes and did not call for the application of the clean hands maxim.

The meaning and application of the "clean hands" maxim is expounded in Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 244–246, 54 S.Ct. 146, 148, 78 L.Ed. 293. Referring to courts of equity, it was said that, 290 U.S. 245, 54 S.Ct., "They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice." To the same effect is Johnson v. Yellow Cab Transit Co., 1944, 321 U.S. 383, at page 387, 64 S.Ct. 622, at page 625, 88 L.Ed. 814, where the Court, reiterated the statement in Keystone Driller Co. v. General Excavator Co., supra, that the clean hands maxim is not a rigid formula which "'trammels the free and just exercise of discretion.'"

The situation here is that General Motors asserts the unconstitutionality of the 1955 Colorado law. The defendant state officials say that General Motors may not maintain the action because it has been and is engaged in an illegal conspiracy through the use of its dealer contracts which are made illegal by the 1955 law. Thus the state officials, by the application of a technical rule of equity, would deprive General Motors of the protection of the federal and state constitutions. From a standpoint of public policy the protection of constitutional rights transcends in importance the application of the clean hands maxim. Otherwise the enforcement of the constitution would be frustrated. Cf. Appon v. Belle Isle Corporation, 1946, 29 Del.Ch. 122, 46 A.2d 749, 760. Equity may not nullify constitutional requirements. Cf. City of Dallas v. Cluck & Murphy, Tex.Civ.App.1921, 234 S.W. 582, 585. As pointed out in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1950,

Cold Metal Process Co., 6 Cir., 1939, 102 F.2d 105. A contrary view was reached by the Seventh Circuit in Brennan v. Hawley Products Co., 7 Cir., 1950, 182 F.2d 945.

6. Cf. Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236; Feddersen Motors v. Ward, 10 Cir., 1950, 180 F.2d 519.

340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219, if General Motors is guilty of an infraction of the anti-trust laws, it may be held responsible in appropriate proceedings. Its alleged illegal conduct does not render constitutional the 1955 Colorado law.

■ Even though the state officials may be right in their contention that the allegations of the stricken defenses relate to wrongful acts which are directly related to the relief sought and that the relief sought would be in furtherance of the conspiracy, nevertheless, such defenses do not bar the prosecution of this action. General Motors is entitled to assert its constitutional rights in a case such as this. Cf. McFarland v. American Sugar Refining Co., supra.

For the reasons stated the two motions to strike the third and fourth defenses were sustained.

### The Motions for Judgment on the Pleadings and for Default

Prior to the argument on the motion to strike the amended third defense and realleged fourth defense, the defendants filed a written statement that they withdrew all pending motions and elected to stand on the third and fourth defenses contained in the amended answer. On April 17, 1956, the Court sustained the plaintiff's motion to strike and ordered trial on the merits set for May 18, 1956, "at which time the plaintiff will be expected to be prepared to sustain the allegations of the complaint." Thereafter, the plaintiff filed a motion for a default and a default judgment, or in the alternative for judgment on the pleadings.

■ It has been held that a motion for judgment on the pleadings under Rule 12(c), Fed.Rules Civ.Proc. 28 U.S.C.A. is not the correct procedural remedy if a defendant has failed to file an answer, but application should be made for the entry of a default judgment. Barron and Holtzoff, Federal Practice and Procedure, vol. 3, § 1214, p. 47; Interstate Commerce Commission v. Daley, D.C.Mass.1939, 26 F.Supp. 421. Accordingly, the motion for judgment on the pleadings is denied.

■ The motion for default and default judgment presents a more serious problem. While it is true that the defendants have elected to stand on their stricken defenses and have interposed no denial of any allegation of the complaint, the important question of the constitutionality of a state statute should not be determined on default. Every presumption favors the constitutionality of a legislative act.[7] A person attacking the constitutionality of state legislation has the burden of establishing such unconstitutionality. State Farm Mut. Auto Ins. Co. v. Duel, 1945, 324 U.S. 154, 65 S.Ct. 573, 89 L.Ed. 812. If the failure of the state officials to deny the allegations of the complaint is to be taken as a concession on their part that the statute in whole or in part is invalid, such a concession will not be accepted in determination of the problem by the Court.[8] Accordingly, this matter may not be disposed of on default and the motion for default and for a default judgment is denied.

■ The situation is not a happy one. State officials have not seen fit in their

---

7. Salsburg v. State of Maryland, 1954, 346 U.S. 545, 553, 74 S.Ct. 280, 98 L.Ed. 281; Davies Warehouse Co. v. Bowles, 1944, 321 U.S. 144, 153, 64 S.Ct. 474, 88 L.Ed. 635; Wampler v. Lecompte, 1930, 282 U.S. 172, 175, 51 S.Ct. 92, 75 L.Ed. 276; Gitlow v. People of State of New York, 1925, 268 U.S. 652, 668, 45 S.Ct. 625, 69 L.Ed. 1138; Atchison, T. & S. F. R. Co. v. Matthews, 1899, 174 U.S. 96, 104, 19 S.Ct. 609, 43 L.Ed. 909; Mugler v. State of Kansas, 1887, 123 U.S. 623, 661, 8 S.Ct. 273, 31 L.Ed. 205.

8. Sage v. Baldwin, D.C.N.D.Tex.1932, 55

F.2d 968, 970; State ex rel. Jacobsmeyer v. Thatcher, 1936, 338 Mo. 622, 92 S.W.2d 640; First Nat. Stores v. Lewis, 1931, 51 R.I. 448, 155 A. 534; Ziegler v. Pickett, 1933, 46 Wyo. 283, 25 P.2d 391; National Bank of Colchester v. Murphy, 1943, 384 Ill. 61, 50 N.E.2d 748; Iowa Motor Vehicle Ass'n v. Board of Railroad Commissioners, 1926, 202 Iowa 85, 209 N.W. 511; Meister v. Carbaugh, 1923, 310 Ill. 486, 142 N.E. 189; Gibson v. Spikes, 1920, 143 Ark. 270, 220 S.W. 56, and Williams v. MacFeeley, 1938, 186 Ga. 145, 197 S.E. 225.

pleadings either to assert or deny the constitutionality of the attacked statute or of any part of it. We recognize the statement in C. I. O. v. McAdory, 1945, 325 U.S. 472, 475, 65 S.Ct. 1395, 89 L.Ed. 1741, that the Court will not pass upon the constitutionality of legislation in a suit which is not adversary or in which there is no actual antagonistic assertion of rights. The application of such a principle here would be unfair to General Motors. It has contracts with its Colorado dealers which, under the literal wording of the statute, it cannot cancel. Those contracts contain provisions which the statute purports to make unlawful. General Motors desires to terminate its existing contracts, to make new contracts with its dealers, and to insert in those new contracts provisions which are forbidden by the 1955 statute. Further, the statute makes it a criminal offense for General Motors to do certain things which it has the contractual right to do under the old contracts and which it desires to include within its new contracts. It is admitted that the defendant state officials intend to enforce the 1955 Act against General Motors. It is inconceivable how the state officials can fail to deny such allegations of threatened action and at the same time decline to assert in any pleading the constitutionality of that Act.

This is in fact an adversary action. There is no intimation of any collusion. The state officials have chosen to rely upon the defense that General Motors is precluded from prosecuting the case because of its alleged misconduct. Upon the striking of the two defenses which raise this point, the state officials have declined to plead further and have elected to stand on stricken defenses. To deny General Motors the right to pursue its claim that the statute is unconstitutional because the state officials have endeavored to remove that question from the adversary category would be to deprive General Motors of the protection of the state and federal constitutions.

Because of these conclusions, the matter was set for trial on May 18, 1956. At that time, through one of its vice-presidents, General Motors presented evidence to sustain the allegations of its complaint. The attorney for the defendants conducted a brief cross examination. No evidence whatsoever was offered by the defendants. The Court requested that attorneys for the parties file briefs on the constitutionality of the 1955 law. Such briefs were filed. The briefs of the defendants concede that certain provisions of the law are unconstitutional, assert that certain other provisions are valid, and completely fail to mention other provisions attacked by General Motors.

We are not aided by any decision of any Colorado court construing or applying the 1955 Act. There is no intimation that any action has been brought in a state court, or will be brought in a state court in the foreseeable future to determine the constitutionality of this law. Cf. Cox v. State of New Hampshire, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049; Schuylkill Trust Co. v. Commonwealth of Pennsylvania, 1938, 302 U.S. 506, 58 S.Ct. 295, 82 L.Ed. 392. We recognize that it is the duty of the federal courts to avoid the unnecessary decision of constitutional questions. Alabama State Federation of Labor v. McAdory, 1945, 325 U.S. 450, 470, 65 S.Ct. 1384, 89 L.Ed. 1725. The extent to which declaratory judgment procedure may be used in the federal courts to control state action lies in the sound discretion of the court. Alabama State Federation of Labor v. McAdory, supra, and Great Lakes Dredge & Dock Co. v. Huffman, 1943, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407.

General Motors, in its verified complaint, alleges that the defendant state officials threaten to enforce the 1955 law and to compel obedience by subjecting General Motors and its employees to fine and imprisonment. It is asserted that unless injunctive relief is granted General Motors will suffer irreparable injury in that:

(1) Operation under its existing agreements will be unlawful;

(2) It will be prevented from collecting many thousands of dollars due to it under existing contracts for a cooperative advertising fund and will be compelled to assume the entire burden of existing advertising commitments;

(3) It will be prohibited from engaging in sales promotion activities which are essential to the sale of its products in the highly competitive automobile market;

(4) The prohibition against the selection of method of delivery of new cars will disrupt its assembly lines and the orderly manufacture and delivery of its products and thus hinder the flow of such products in interstate commerce and the sale thereof;

(5) It will be required to do business with motor vehicle dealers without its consent;

(6) It will be unable to maintain an aggressive competitive dealers' organization necessary for it to compete effectively in the Colorado market;

(7) Its damages cannot be measured in dollars and cannot be collected from anyone.

 Courts of equity do not ordinarily restrain criminal prosecutions. An exception to this rule exists when the prevention of such prosecutions under alleged unconstitutional enactments is essential to the safeguarding of rights of property, and when the circumstances are exceptional and the danger of irreparable loss is both great and immediate.[9] We recognize the rule stated thus in Beal v. Missouri Pac. R. R. Corp., 1941, 312 U.S. 45, 50, 61 S.Ct. 418, 421, 85 L. Ed. 577:

> "And in the exercise of the sound discretion, which guides the determination of courts of equity, scrupulous regard must be had for the rightful independence of state governments and a remedy infringing that independence which might otherwise be given should be withheld if sought on slight or inconsequential grounds."

General Motors has made an impressive showing of great potential injury to its business. That showing is not controverted. The state officials are in the anomalous position of admitting an intent to enforce a statute, the unconstitutionality of which they fail to deny by their pleadings. They do not offer, as did the Nebraska officials in Beal v. Missouri Pac. R. R. Corp., supra, to obtain a judicial determination of the question in "a single test suit to be instituted in the state courts." Here, there are exceptional circumstances and a clear showing of the necessity to prevent irreparable injury.[10] General Motors presents a case "in which the question of the validity of the act under which, if invalid, great injuries to properties and businesses are being unjustly inflicted should be promptly settled." [11]

It is in the public interest to determine the constitutionality of the 1955 law. We cannot escape the burden of a careful consideration of the many constitutional questions which are raised.

### The Constitutionality of the Law

(a) *The Licensing Provisions*

The 1955 law contains the following definitions:[12]

(a) "Manufacturer" is any person or firm, resident or non-resident, who manufactures or assembles new and unused motor vehicles.

9. Cline v. Frink Dairy Co., 1927, 274 U.S. 445, 452, 47 S.Ct. 681, 71 L.Ed. 1146; Fenner v. Boykin, 1926, 271 U.S. 240, 243, 46 S.Ct. 492, 70 L.Ed. 927; Hygrade Provision Co. v. Sherman, 1925, 266 U.S. 497, 500, 45 S.Ct. 141, 69 L.Ed. 402; Packard v. Banton, 1924, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596; Terrace v. Thompson, 1923, 263 U.S. 197, 214, 44 S.Ct. 15, 68 L.Ed. 255; Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714.

10. Beal v. Missouri Pac. R. R. Corp., supra, 312 U.S. at page 50, 61 S.Ct. at page 421.

11. Cline v. Frink Dairy Co., supra, 274 U.S. at page 452, 47 S.Ct. at page 683.

12. 1955 Colorado Session Laws, ch. 77, p. 198.

(b) "Distributor" or "Wholesaler" is any person or firm, resident or non-resident, who is owned or operated in whole or in part by a manufacturer and who sells or distributes new and unused motor vehicles to dealers.

Factory and distributor branches and representatives are also specifically defined.

All of the foregoing are required to obtain licenses from the Colorado Director of Revenue, who is designated as the administrator of the law. The fee is $25 for manufacturers and distributors and their branches; for their representatives, the fee is $15. The law requires a $5,000 bond, conditioned that the applicant "shall not practice fraud, make any fraudulent representation or violate any of the provisions of this article in the conduct of the business for which he is licensed." [13]

The 1945 law created an advisory *board* of five members appointed "from among the licensed dealers." [14] The 1955 Act in its section 5 amending 1953 C.R.S. § 13–11–3(9), provides for meetings of the advisory *board*.

Section 12 of the 1955 law provides that before the administrator shall refuse, revoke, or suspend a license he shall give the applicant or licensee written notice of his contemplated action. The applicant or licensee may then show cause in writing why such contemplated action should not be taken. Upon such a showing the administrator refers the matter to "the advisory *committee*" which conducts a hearing and makes findings as provided in Sections 12, 14 and 15 of the 1955 act. In those three sections the term "advisory *committee*" is used eleven times.

The statutes, both 1945 and 1955, completely fail to provide for the creation or composition of any advisory *committee*.

The uncontradicted testimony is that the cost of the licenses and bonds to General Motors is $5,285. [15] In 1955 General Motors sold to its Colorado dealers motor vehicles, equipment, accessories, and parts for the total sum of $91,696,000. The equivalent figure for 1954 was $62,484,000.

General Motors contends that the licensing provisions require the payment of a license fee and the procurement of a bond for the privilege of soliciting interstate business and hence constitute an unlawful burden and restriction on interstate commerce. Reliance is placed on the so-called "drummer" cases, of which Memphis Steam Laundry Cleaner, Inc., v. Stone, 1952, 342 U.S. 389, 72 S.Ct. 424, 96 L.Ed. 436, is typical.

The license fee is required of both residents and non-residents and makes no distinction between those engaged in interstate commerce and those engaged in intra-state commerce. Hence, it is not discriminatory. The collected license fees are to be used "To pay the expenses of maintaining the administrator's office and of administering and enforcing" the law. [16] There is no claim by General Motors that the license fee is larger in amount than that reasonably required to defray the administrative expense. The bond is to protect the public from fraud, fraudulent representation, or violations of the law. [17]

In Braniff Airways, Inc., v. Nebraska State Board of Equalization and Assessment, 1954, 347 U.S. 590, 597, 74 S.Ct. 757, 762, 98 L.Ed. 967, there is a reiteration of the rule that: [18]

13. Id. §§ 3, 7, 8, pp. 199–200.

14. 1953 C.R.S. § 13–11–4(1).

15. In one oral argument counsel for the defendants urged that the court is without jurisdiction because of the lack of the requisite amount involved. This uncontradicted testimony of the cost of the licenses and bonds is sufficient to sustain the jurisdictional requirement.

16. 1955 Colorado Session Laws, § 7, p. 200.

17. Id. Sec. 8, p. 200.

18. To the same effect are Michigan-Wisconsin Pipe Line Co. v. Calvert, 1954, 347 U.S. 157, 165, 74 S.Ct. 396, 98 L.Ed. 583; Western Live Stock v. Bureau of Revenue, 1938, 303 U.S. 250, 254, 58 S.Ct. 546, 82 L.Ed. 823, and Postal Tel-

" * * * the Commerce Clause does not immunize interstate instrumentalities from all state taxation, but that such commerce may be required to pay a nondiscriminatory share of the tax burden."

The controlling principle is found in Union Brokerage Co. v. Jensen, 1944, 322 U.S. 202, 211, 64 S.Ct. 967, 973, 88 L.Ed. 1227, wherein, quoting from Sprout v. City of South Bend, 1928, 277 U.S. 163, 169, 48 S.Ct. 502, 72 L.Ed. 833, it is said:

"In the absence of applicable federal regulation, a State may impose non-discriminatory regulations on those engaged in foreign commerce 'for the purpose of insuring the public safety and convenience; * * * a license fee no larger in amount than is reasonably required to defray the expense of administering the regulations may be demanded.'"

 While we hold that there is no constitutional inhibition against the licensing and bonding requirements of the 1955 law, another problem is presented. The law requires that before a license may be denied, suspended, or revoked, the applicant or licensee, upon a showing of good cause, is entitled to a hearing before an advisory *committee*. Yet, no advisory *committee* is created. The 1945 law establishes an advisory *board,* and the 1955 act provides for meetings of an advisory *board* in its section 5.

Colorado follows the rule that the courts have power to correct evident errors in words or figures so as to give an act its manifest meaning, Capp v. People, 1917, 64 Colo. 58, 60, 170 P. 399, but that rule may not be applied here because the term "advisory committee" is used eleven times in Sections 12, 14, and 15 of the 1955 act. One change from "advisory board" to "advisory committee" might have been error or inadvertence. The continued use of the term "advisory committee" indicates a legislative intent to provide for the hearing of license denials, suspensions and revocations by some other body than the "advisory board" created by the 1945 act and referred to in Section 5 of the 1955 act. This conclusion is strengthened by the fact that the 1945 act regulating dealers provides that the advisory board consists of five members appointed "from among the licensed dealers".[19] It is reasonable to infer that, when the act was amended in 1955 to apply also to manufacturers and distributors, the legislature considered that the denial, suspension, and revocation of their licenses should not be determined by a body made up exclusively of dealers.

 Every word, phrase, clause, sentence, paragraph and section in a statute must be given meaning or effect if it is possible so to do.[20] The courts may not speculate as to the probable intent of the legislature apart from the words. McClain v. Commissioner of Internal Revenue, 1941, 311 U.S. 527, 61 S.Ct. 373, 85 L.Ed. 319.

 Colorado has the rule that in construing statutory amendments it is fundamental that change in meaning must be attributed to change in language.[21] In making material changes in the language of a statute, the legislature cannot be presumed to have regarded such changes as without significance, but must be presumed to have had a reasonable motive. Shamrock Oil & Gas Corp. v. Sheets, 1941, 313 U.S. 100, 107, 61 S. Ct. 868, 85 L.Ed. 1214.

 In this case we must assume that the change from "board" to "com-

egraph-Cable Co. v. City of Richmond, 1919, 249 U.S. 252, 259, 39 S.Ct. 265, 63 L.Ed. 590.

19. 1953 C.R.S. § 13–11–4(1).

20. People v. Rapini, 1941, 107 Colo. 363, 366, 112 P.2d 551, 134 A.L.R. 545; Woodmen of the World v. McCue, 1930, 88 Colo. 209, 213, 294 P. 947; City and County of Denver v. Taylor, 1930, 88 Colo. 89, 95, 292 P. 594.

21. Samples v. Board of County Commissioners, 1930, 87 Colo. 227, 231, 286 P. 273; People ex rel. Shaklee v. Milan, 1931, 89 Colo. 556, 564, 5 P.2d 249, and see Johnson v. United States, 1912, 225 U.S. 405, 415, 32 S.Ct. 748, 56 L.Ed. 1142.

mittee" is significant and meaningful. To change the phrase "advisory committee" to "advisory board" each of the eleven times that it occurs, would constitute judicial legislation. Courts, under the guise of interpretation, may not nullify or vary the plain terms of a legislative enactment.[22]

■ The 1955 law is incomplete in that it fails to provide for the creation of the "advisory committee." The effect of this fault will be given consideration later in connection with the problem of severability of the statute.

**(b) *The Criminal Provisions***

The 1945 act provides [23] that certain conduct of a licensee is unlawful and imposes a penalty of a fine of not less than $75 nor more than $500 or imprisonment for not more than six months, or both fine and imprisonment.[24] The 1945 act applies only to dealers. The 1955 amendment which brings in manufacturers and distributors, amends section 13–11–14 to make unlawful certain conduct of a manufacturer or distributor. Some of those provisions which General Motors urges as unconstitutional will be noted.

(1) Inducement of delivery acceptance, orders, agreements and advertising payments.

Section 11 of the 1955 act adds to the 1945 act a provision which, if one may cut through the weird grammar, makes it unlawful for a manufacturer or distributor to induce or coerce, or attempt to induce or coerce, a motor vehicle dealer:

(a) To accept delivery of unordered motor vehicles, parts or accessories;

(b) To order or accept delivery of motor vehicles with special features or equipment not included in the list price of the motor vehicle as publicly advertised by the manufacturer; and

(c) To order for any person any parts, accessories "or any commodity whatsoever."

The 1955 law also adds § 13–11–14(10) (b) which declares it unlawful for a manufacturer or distributor to induce or coerce a dealer to enter into an unfair agreement and 13–11–14(10) (e) which, in its first portion (before the semicolon), forbids the inducement of payments for advertising.

While it may be conceded that, under its police power, a state may protect its people against coercion, inducement is another thing. We agree with General Motors that there is nothing evil or wrong about inducing. It is simply the process of salesmanship. According to Webster's New International Dictionary, "induce" means "to lead on, to influence, to prevail on, to move by persuasion or influence." "Induce" is to persuade by legitimate argument or demonstration. It is distinguished from "coerce", which is to compel by threat or other wrongful action.

The evidence of General Motors is that through its engineering staff and research department it is continually developing improvements in motor vehicles, accessories, equipment, and tools. These are new and untried. The dealer must be induced to take them. In answer to a question as to whether it would be possible for General Motors to conduct its extensive research operations if it were not permitted to induce its dealers to buy the results of such research, William F. Hufstader, a vice-president of General Motors, testified:

> "We feel definitely not. We feel that that is a very important and vital part of our program, and that if the products which are developed there do not have an opportunity to be known by the dealer and to be used by him and to have experience,

22. Southern S.S. Co. v. N. L. R. B., 1942, 316 U.S. 31, 44, 62 S.Ct. 886, 86 L.Ed. 1246; City National Bank, Lawton, Okl. v. United States, 10 Cir., 1953, 207 F.2d 741, 744; cf. 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 1951, 340 U.S. 593, 600, 71 S.Ct. 515, 95 L.Ed. 566.

23. 1953 C.R.S. § 13–11–14.

24. Id. § 13–11–18.

then the whole undertaking is stifled and throttled and one of the outstanding characteristics that has been a part of the automobile industry does not have adequate life-blood."

Salesmanship is part of the American way of life. The selling of new products requires inducement. If there is no inducement, the public acceptance of the product is minimized. If new products will not sell, there is no incentive to produce them. If there is no incentive to produce, then progress has ended and stagnation has begun.

 The 1955 act does not regulate inducement. Rather, it forbids it. In so doing, it creates an oppressive and unreasonable burden on interstate commerce which clearly violates the commerce clause. Lemke v. Farmers' Grain Co., 1922, 258 U.S. 50, 59, 42 S.Ct. 244, 66 L.Ed. 458; cf. Breard v. City of Alexandria, 1951, 341 U.S. 622, 633–637, 71 S.Ct. 920, 95 L.Ed. 1233, and Nippert v. City of Richmond, 1946, 327 U.S. 416, 425–426, 66 S.Ct. 586, 90 L.Ed. 760.

We hold that the new subsections, 13–11–14(9), 13–11–14(10) (b) and 13–11–14(10) (e), as added by the 1955 act, violate the commerce clause in so far as they purport to render unlawful the actions of a manufacturer or distributor to induce or attempt to induce the conduct therein mentioned. The problem of whether these sections may be upheld otherwise will be considered in connection with the severability of the statute.

(2) Cancellation of franchise of motor vehicle dealer.

Section 13–11–14, as amended and extended by the 1955 act[25] now reads in part as follows:

"It shall be unlawful and a violation of this article for the holder of any license issued under the terms and provisions hereof:

\* \* \* \* \* \*

"(10) Being a manufacturer of motor vehicles, distributor \* \* \*; who:

\* \* \* \* \* \*

"(c) Has unfairly, without due regard to the equities of said dealer and without just provocation, canceled the franchise of any motor vehicle dealer. The non-renewal of a franchise or selling agreement without just provocation or cause shall be deemed an evasion of this paragraph and shall constitute an unfair cancellation."

We construe this inept language to mean that it is unlawful and a criminal offense for a manufacturer or distributor to cancel or fail to renew a motor vehicle dealer's agreement "unfairly, without due regard to the equities of said dealer and without just provocation." If the section is not so construed it is meaningless.

 General Motors urges that this part of the 1955 act violates the Fourteenth Amendment in that it fails to provide an ascertainable standard of guilt and hence denies due process. We agree.

 The applicable rule is stated in Connally v. General Const. Co., 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322:[26]

---

25. Id. Sec. 11, p. 203.

26. In applying this rule the Supreme Court has held that the following statutory provisions are insufficient because of vagueness: International Harvester Co. of America v. Commonwealth of Kentucky, 1914, 234 U.S. 216, 221–224, 34 S.Ct. 853, 855, 58 L.Ed. 1284 (raising prices above " 'market value under fair competition, and under normal market conditions' "); Collins v. Commonwealth of Kentucky, 1914, 234 U.S. 634, 34 S.Ct. 924, 58 L.Ed. 1510 (same); United

States v. L. Cohen Grocery Co., 1921, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (to make any unjust or unreasonable rate or charge in \* \* \* dealing in \* \* \* any necessaries); Connally v. General Const. Co., supra (current wage in any locality); Cline v. Frink Dairy Co., 1927, 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (market at a reasonable profit); Stromberg v. People of State of California, 1931, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (displaying any " 'symbol or emblem of opposition

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

The case of Cline v. Frink Dairy Co., supra, is noteworthy because there the Supreme Court held unconstitutional a Colorado antitrust law which denounced certain defined combinations in restraint of trade and then provided that, 274 U.S. 456, 47 S.Ct. 684:

" 'No agreement or association shall be deemed to be unlawful or within the provisions of this act, the object and purposes of which are to conduct operations at a reasonable profit or to market at a reasonable profit those products which cannot otherwise be so marketed: * * *.' "

The Court held that a legislature must fix the standard more simply and more definitely before a person must conform or a jury can act. 274 U.S. 465, 47 S.Ct. 687.

The section of the 1955 act now under consideration uses the terms "unfairly," "without due regard to the equities", and "without just provocation." These involve "so many factors of varying effect that neither the person to decide in advance nor the jury to try him after the fact can safely and certainly judge the result." Cline v. Frink Dairy Co., supra, 274 U.S. at page 465, 47 S.Ct. at page 687. Accordingly, due process is denied.

The state officials contend in their brief that this defect may be cured by an administrative regulation.[27] The argument is not persuasive. A legislature may authorize an executive officer or body to make rules and regulations for the purpose of carrying out the objects of a statute and may make a violation of such rules a criminal offense. United States v. Grimaud, 1911, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563. However, there must be a "primary standard". Cf. Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 427, 55 S.Ct. 241, 79 L.Ed. 446. Here the primary standard is lacking. Cf. Koshland v. Helvering, 1936, 298 U.S. 441, 447, 56 S.Ct. 767, 80 L.Ed. 1268. The power to prescribe rules and regulations is not the power to make law for that may not be delegated by the legislature. Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 1936, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528. The defect in the 1955 law cannot be cured by any act of the administrator. Even if it could be, there is no showing that any administrative regulations ever have been adopted or that the administrator has any intent of making any such regulations. We must decide the case on the record now before us and not speculate on what may or may not be done.

to organized government' "); Smith v. Cahoon, 1931, 283 U.S. 553, 564–565, 51 S.Ct. 582, 75 L.Ed. 1264 (such provisions regulating common carriers as could be constitutionally applied to private carriers); Herndon v. Lowry, 1937, 301 U.S. 242, 261–264, 57 S.Ct. 732, 81 L.Ed. 1066 (distribution of pamphlets intended at any time in the future to lead to forcible resistance to law); Lanzetta v. State of New Jersey, 1939, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (gang); cf. Musser v. State of Utah, 1948, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562 (injurious to public morals). Decisions involving criminal statutes found to be adequately definite are collected in Gorin v. United States, 1941, 312 U.S. 19, 27, note 13, 61 S.Ct. 429, 85 L.Ed. 488.

27. By 1953 C.R.S. 13–11–3(1) the administrator has power "From time to time to promulgate, amend, and repeal such reasonable rules and regulations, not inconsistent with this article and the laws of the state of Colorado, as he shall deem necessary, to carry out the purposes of this article."

(3) Method of shipment of new motor vehicles.

Again ignoring the confused grammar of the 1955 law, we construe the new section 13–11–14(10) (d) to make it a crime for a manufacturer or distributor to refuse

"to extend to a motor vehicle dealer the privilege of determining the mode or manner of available transportation facility which said dealer desires to be used or employed in making deliveries of new motor vehicles to him or it; * * *."

General Motors makes a convincing showing that it must retain control over the method of shipment of new motor vehicles. Production lines turn out cars at the rate of forty to fifty an hour. Storage facilities in the vicinity of factories are not available. The quick and orderly removal of cars from the ends of production lines is essential to the maintenance of production schedules. The witness Hufstader testified that it would not be possible for General Motors to continue the production of its automobiles at the rate at which it is now producing them if it had to give to each dealer the right to take his cars at the plant or to direct the mode and method of delivery of cars ordered by him. Among other things, he said:

" * * * the entire system in which we function is such that if the control goes into the hands of 18,500 dealers instead of being here at a central point we feel that we will be utterly unable to cope with the situation like that and that we'd have confusion confounded. We are struggling with a very complex situation as it is and we have tried this very thing a number of years ago and it was utter failure."

The 1955 act contains no declaration of policy as to the public benefit to be derived from such regulation. By neither pleadings nor evidence do the defendant state officials assert any public benefit. We can find no public benefit from anything that appears in the case or from anything that we may judicially notice. Indeed, the showing and the inferences reasonably drawn therefrom are all to the contrary. If the production rate cannot be maintained, the unit costs rise, and the public pays more for its automobiles.

The Fourteenth Amendment protects the right to contract. Allgeyer v. State of Louisiana, 1897, 165 U.S. 578, 589, 17 S.Ct. 427, 41 L.Ed. 832. This right is subject to restrictions, e. g. United States v. Joint Traffic Association, 1898, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259, including the reserved power of the state to safeguard the vital interests of its people. Home Building & Loan Ass'n v. Blaisdell, 1934, 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413. We recognize that, in the domain of the reserve power of a state, federal courts must respect the wide discretion on the part of the legislature in determining what is and what is not necessary. East New York Savings Bank v. Hahn, 1945, 326 U.S. 230, 233, 66 S.Ct. 69, 90 L.Ed. 34. The question is "whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end". Home Building & Loan Ass'n v. Blaisdell, supra, 290 U.S. at page 438, 54 S.Ct. at page 240. On the basis of the record before us we hold that, as to Section 13–11–14(10) (d) relating to the shipment by a manufacturer or distributor of new motor vehicles, the end is not legitimate and the measures taken are neither reasonable nor appropriate. Hence, the section is invalid.

(4) Payments for Advertising.

We now come to a grammatical maze. Section 13–11–14(10) (e), as amended and extended by the 1955 act, reads thus in its essential requirements:

"It shall be unlawful and a violation of this article for the holder of any license issued under the terms and provisions hereof:

 * * * * * *

"(10) Being a manufacturer of motor vehicles, distributor, * * *; who:

\* \* \* \* \* \*

"(e) Has attempted to induce, compel, or otherwise require, \* \* \* any motor vehicle dealer to pay over \* \* \* any amount \* \* \* for any advertising \* \* \* implementing the sale of motor vehicles; nor to demand, \* \* \* or require of any licensed motor vehicle dealer to be charged with, to pay over, \* \* \* any amount which is projected \* \* \* for the advertisement \* \* \* of any motor vehicle which is being sold under franchise by any motor vehicle dealer to the detriment, embarrassment, or financial disadvantage of such motor vehicle dealer, unless the aforesaid franchised motor vehicle dealer shall have agreed in writing to become a party to any of the aforesaid plans, projects, \* \* \* as delineated herein."

So far as inducement is concerned, we have already held this section void as an unreasonable burden on interstate commerce.

The phrase beginning "nor to demand" remains to be considered. To paraphrase the section even more briefly than above, it reads:

"It shall be unlawful \* \* \* for the holder of any license \* \* \*: Being a manufacturer of motor vehicles \* \* \*; who: \* \* \*; nor to demand \* \* \*."

■ Passing quickly over such frailties of language, we conclude that the inhibition comes into operation when it is "to the detriment, embarrassment, or financial disadvantage" of the dealer, unless he agrees in writing. These terms do not fix any ascertainable standard. Under the rule established in Cline v. Frink Dairy Co., and other cases cited supra, they are so lacking in certainty and definiteness as to deny due process.

Because of the confusion of language we are unable to segregate the "nor to demand" phrase from that which precedes it. Accordingly, the entire section is without effect.

(c) The Termination of Contracts Provision.

Section 9 of the 1955 act amends Section 13–11–11 by adding a new subsection which provides in substance that any cancellation, delay of renewal of, or substitution of a motor vehicle dealer's contract shall not be effective until and unless an effective court order be obtained and further that on application to any state or federal court such court shall issue an injunction without indemnity bond, staying any action until determination on the merits.

■ General Motors urges that to compel it in the operation of its private business to continue business relations with dealers without its consent is beyond the scope of the police power. In support of such position counsel cite Chas. Wolff Packing Co. v. Court of Industrial Relations of Kansas, 1925, 267 U.S. 552, 45 S.Ct. 441, 69 L.Ed. 785, wherein a Kansas compulsory arbitration law was held invalid because of infringement on the liberty of contract and rights of property guaranteed by the due process of law clause of the Fourteenth Amendment. While the day is gone when the Fourteenth Amendment may be used to invalidate state laws "because they may be unwise, improvident, or out of harmony with a particular school of thought", Williamson v. Lee Optical, 1955, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563, nevertheless a state may not, under the guise of protecting the public interest, arbitrarily interfere with private business by the use of unusual and unnecessary restrictions upon lawful occupations.[28] The issue is whether the state law is arbitrary and unreasonable.

28. Lawton v. Steele, 1894, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385; Thompson v. Consolidated Gas Utilities Corp., 1937, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510; Treigle v. Acme Homestead Ass'n, 1936, 297 U.S. 189, 56 S.Ct. 408, 80 L.Ed. 575.

In their briefs, the state officials strongly urge the validity of this section. They say that the need for state regulation of the contracts of automobile manufacturers with their dealers has been judicially noticed, and they call our attention to such cases as Buggs v. Ford Motor Co., 7 Cir., 1940, 113 F.2d 618; Kuhl Motor Co. v. Ford Motor Co., 1955, 270 Wis. 488, 71 N.W.2d 420; and the decision of the United States District Court for the District of Minnesota entitled Willys Motors, Inc., v. Northwest Kaiser-Willys, Inc., 142 F.Supp. 469. They assert that it is settled that General Motors is

> "in position to impose and did impose their will on the independent dealer-purchaser, not only as to how he was to conduct his business, but also as to whether he would conduct it at all." United States v. General Motors Corp., 7 Cir., 1941, 121 F.2d 376, 398.

We have no quarrel with any of those cases. They may be good law on the facts presented to or judicially noticed by the courts deciding them. The difficulty here is that we have no declaration of legislative intent, no pleadings, and no evidence to sustain the contention that this regulation is a reasonable and valid exercise of the police power.

The argument that such police regulation is reasonable is based on the asserted economic disparity between General Motors and its dealers. If the relative size or financial strength of the parties is to be controlling, we are left in the dark. We cannot judicially notice either the economic position of General Motors or of any of its Colorado dealers. No Colorado motor vehicle dealer is before the Court complaining of any mistreatment by General Motors. On the basis of the record before us, we cannot say that the dealer contracts are unilateral or lack mutuality. Nor can we say that the interests of the public require that any automobile dealer or group of automobile dealers be continued in business. It may be that the interests of the public in assuring that the strong do not oppress the weak, require legislation such as this, but so far as this case is concerned the essential economic disparity is not established. We are not going to infer it. We cannot say on the record here whether the Colorado legislature acted arbitrarily and unreasonably, or properly and wisely.

Our attention has been directed to the July 30, 1956 decision of the Colorado Supreme Court entitled, Mosko v. Dunbar, —— P.2d ——, ——.[29] Therein, the Court held unconstitutional a 1955 act [30] of the Colorado legislature prohibiting the sale of motor vehicles on Sunday on the grounds of violation of Article V, section 25 [31] of the Colorado Constitution and of the Fourteenth Amendment. The Court said that "such restraints upon freedom of action to carry on a legitimate business" can be justified only if they are reasonable and proper and "bear a real and substantial relation to the protection of the public health, morals, welfare or safety." The position of the Court is well expressed in the following quotation from its opinion:

> "We are cognizant of the trend of judicial opinions during the recent decade to allow agencies of government to encroach more and more upon individual liberties and freedom. We conclude that if constitutional government is to survive and a system of free enterprise continue, it must in fact be free from unreasonable and unnecessary regulations by government. The time has come, we believe, when we must re-evaluate our own decisions to determine whether we have contributed to that

---

29. The decision was 4–3. At the time of the filing of this opinion the time for rehearing has not expired and the decision has not been reported.

30. 1955 Colorado Session Laws, ch. 81, pp. 214–215.

31. This provides: "The general assembly shall not pass local or special laws in any of the following enumerated cases [none of which are applicable here, and then concludes]. In all other cases, where a general law can be made applicable, no special law shall be enacted."

creeping paralysis which seems to have permeated the once deep-rooted concepts of constitutional freedom and which protected the citizen from unreasonable governmental restraints. The Supreme Court of the United States once said: 'Freedom is the general rule, and restraint the exception.' [Chas.] Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 632, 67 L.Ed. 1103. If statutes such as the one involved in the instant case are valid when subjected to the test of reasonableness then the rule might well be revised to read: 'Restraint is the general rule, freedom the exception.'"

The application of this reasoning to the termination of contract provision here under consideration would require a decision that it is unconstitutional. Such might well be the holding of the Colorado Court and as such, binding on federal courts. However, no Colorado Court has spoken on the precise issue with which we are here concerned. Reasoning by analogy is often dangerous. The record before us is not satisfactory. As will be later noted, we have determined that in any event the entire 1955 law must fall.

 Under the circumstances, we express no opinion on the validity of this section except to hold that it does not apply to the General Motors contracts in existence at the time the 1955 law became effective.

The Colorado Constitution provides in its Art. II, sec. 11 that:

"No ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly."

The Colorado courts have held that the rights of contracting parties are to be determined by the law in force at the time the contract is written. See McCowan v. Equitable Life Assurance Society, 1947, 116 Colo. 78, 81, 179 P.2d 275; First National Bank of Northampton, Mass. v. Arthur, 1897, 10 Colo.App. 283, 285, 50 P. 738. This conforms to the decision of the Seventh Circuit in a case involving a Ford Motor Company contract. Buggs v. Ford Motor Co., 7 Cir., 1940, 113 F.2d 618, 621.

The 1955 law operates only prospectively. It has no application to contracts existing at the time of its enactment.[32]

*Severability*

The 1955 act contains no severability clause. Colorado has a general statute on severability which is set out below.[33]

We have held that the licensing provisions of the 1955 act are incomplete in that the legislature failed to create the "advisory committee" which is charged with the responsibility of passing upon the denial, suspension, or revocation of licenses. Also, we have held that seven penal subsections are void either in whole or in part. Such void provisions relate to the inducement of sales and contracts, the unfair termination of contracts, the mode of delivery of new motor vehicles, and payments to advertising and solicita-

32. If the holding were otherwise, an anomalous situation would be created for the 1955 act purports to make many of the provisions of the existing contracts unlawful. General Motors may not be forced into a position where on the one hand important contract provisions are invalid and on the other hand such unlawful contracts continue in existence until terminated in accordance with the statute.

33. 1953 C.R.S., 135–1–5 provides: "If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid, unless it appears to the court that the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."

tion plans. Other provisions of the act primarily concern procedural matters with the exception of the prohibition of the cancellation of motor vehicle dealer-manufacturer contracts without court order.

The severability problem thus boils down to two questions: First, may the licensing provisions stand in view of the failure of the legislature to create the "advisory committee;" and, second, may the termination provision stand if licenssing provisions, or the criminal provisions, or both, are eliminated.

We have held the licensing provisions valid but we cannot say that the legislature would have enacted such provisions without supplying some agency to pass on the denial, suspension, or revocation of licenses. The legislative intent is plain from the provision for the hearing of such matters by an advisory committee. The vice is in the failure to create the committee. The licensing provisions are incomplete and are incapable of being executed in accordance with the legislative intent. Hence, they cannot be upheld.

While we have not passed on the constitutionality of the provision relating to contract cancellation without court order, we have held that the criminal section relative to unfair contract cancellation is void. It is inconceivable to us that the legislature intended the termination of contract provision to stand alone. It is essentially and inseparably connected with, and dependent upon, the void provisions. It cannot be presumed that the legislature would have enacted the termination of contract provision without the licensing and penal provisions which we have held void. It follows that the entire statute is invalid and may not be enforced.

It is deemed that this opinion sufficiently states the findings of fact and conclusions of law of the Court. Further or additional findings and conclusions are not necessary. The attorneys for the plaintiff, within ten days, shall submit a judgment and decree in accordance with the views herein expressed.